## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD J. LYMAN, WILLIAM F. WELD, and ROBERT D. CAPODILUPO, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLES D. BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts; and WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of State of the Commonwealth of Massachusetts, <br><br> Defendants. | Civil Action No. 18-10327-PBS |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Seth V. Jackson, Esq., BBO # 658669
ZELLE LLP
161 Worcester Road, Suite 502
Framingham, MA  01701
Telephone:  (781) 466-0700
Facsimile:  (781) 466-0701
sjackson@zelle.com

*Counsel for Plaintiffs Richard J. Lyman,*
*William F. Weld, and Robert D. Capodilupo*

## Table of Contents

INTRODUCTION .................................................................................................................. 1

STANDARD OF REVIEW ................................................................................................... 3

ARGUMENT ......................................................................................................................... 3

I.   PLAINTIFFS HAVE STANDING TO BRING THESE CLAIMS ............................... 3

  A.  **Plaintiffs Have Alleged a Concrete and Particularized Injury** ..................... 4

  B.  **Plaintiffs' Alleged Injury Will Be Redressed By a Favorable Ruling** .......... 6

II.  **PLAINTIFFS' CLAIMS ARE NOT FORECLOSED BY HISTORICAL FACT OR LEGAL PRECEDENT** ............................................................................................ 7

  A.  **History Does Not Resolve the Constitutionality of WTA** ............................... 7

  B.  **Defendants' Cited Precedent Does Not Address the Legal Questions Presented by Plaintiffs' Claims and Predates Important Doctrinal Shifts** ....................... 9

III. **WTA VIOLATES "ONE PERSON, ONE VOTE"** ..................................................... 13

  A.  **Defendants Rely on a Fiction of Convenience** ................................................. 14

  B.  **Understood as a Presidential Election, WTA Violates One Person, One Vote** ... 14

  C.  **Misunderstood as an Elector Election, WTA Violates One Person, One Vote** ... 16

IV.  **WTA VIOLATES PLAINTIFFS' RIGHT TO FREEDOM OF ASSOCIATION** ....... 19

CONCLUSION ...................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Allen v. State Bd. of Elections*,
    393 U.S. 544 (1969).................................................................................................17

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983).............................................................................................11, 20

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011).................................................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................3

*Baker v. Carr*,
    369 U.S. 186 (1962).................................................................................................4, 5

*Black v. McGuffage*,
    209 F. Supp. 2d 889 (N.D. Ill. 2002) .....................................................................13

*Blackstone Realty LLC v. F.D.I.C.*,
    244 F.3d 193 (1st Cir. 2001).....................................................................................3

*Buckley v. Valeo*,
    424 U.S. 1 (1976)....................................................................................................11

*Burdick v. Takushi*,
    504 U.S. 428 (1992).................................................................................................19

*Bush v. Gore*,
    531 U.S. 98 (2000).........................................................................................1, 12, 13

*California Dem. Party v. Jones*,
    530 U.S. 567 (2000)...................................................................................................8

*Conant v. Brown*,
    248 F. Supp. 3d 1014 (D. Or. 2017) .......................................................................13

*Delaware v. New York*,
    385 U.S. 895 (1966).................................................................................................13

*Employment Div., Dept. of Human Res. v. Smith*,
    494 U.S. 872 (1990).................................................................................................19

*Fischer v. Cruz*,
    No. 16-cv-1224, 2016 WL 1383493 (E.D.N.Y. Apr. 7, 2016).................................5

*Froelich v. FEC*,
   855 F. Supp. 868 (E.D. Va. 1994), *aff'd*, 57 F.3d 1066 (4th Cir. 1995)...................................5

*Gill v. Whitford*,
   No. 16-1161, 2018 WL 3013807 (U.S. June 18, 2018) ...........................................................5

*Gordon v. Lance*,
   403 U.S. 1 (1971)...................................................................................................................16

*Graham v. Fong Eu*,
   403 F. Supp. 37 (N.D. Cal. 1975) ....................................................................................11, 16

*Gray v. Sanders*,
   372 U.S. 368 (1963).......................................................................................................*passim*

*Harper v. Virginia*,
   383 U.S. 663 (1966)................................................................................................................1

*Hitson v. Baggett*,
   446 F. Supp. 674 (M.D. Ala 1978.), aff'd without opinion, 580 F.2d 1051 (5th
   Cir. 1978) ...............................................................................................................................13

*Hunter v. Hamilton Cty. Bd. of Elections*,
   635 F.3d 219 (6th Cir. 2011) .................................................................................................12

*Hunter v. Hamilton Cty. Bd. of Elections*,
   850 F. Supp. 2d 795 (S.D. Ohio 2012) .................................................................................13

*Jones v. Bush*,
   122 F. Supp. 2d 713 (N.D. Tex.), *aff'd*, 244 F.3d 134 (5th Cir. 2000)...................................5

*Kusper v. Pontikes*,
   414 U.S. 51 (1973).................................................................................................................20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................................................................4

*Mandel v. Bradley*,
   432 U.S. 173 (1977).....................................................................................................10, 11, 12

*McCutcheon v. Federal Election Comm'n.*,
   134 S. Ct. 1434 (2014).....................................................................................................8, 20

*McPherson v. Blacker*,
   146 U.S. 1 (1892).....................................................................................................10, 11, 14

*NLRB v. Noel Canning*,
   134 S. Ct. 2550 (2014)............................................................................................................9

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015)................................................................................................7

*Penton v. Humphrey*,
   264 F. Supp. 250 (S.D. Miss. 1967)........................................................................13

*Public Integrity All., Inc. v. Tucson*,
   836 F.3d 1019 (9th Cir. 2016) .........................................................................11, 15

*Reynolds v. Sims*,
   377 U.S. 533 (1964)..........................................................................................4, 6, 19

*Schweikert v. Herring*,
   Case No. 3:16-CV-00072, 2016 WL 7046845 (W.D. Va. Dec. 2, 2016)................13

*Tashjian v. Republican Party of Conn.*,
   479 U.S. 208 (1986)............................................................................................3, 20

*United States v. SCRAP*,
   412 U.S. 669 (1973)...................................................................................................4

*Washington v. Davis*,
   426 U.S. 229 (1974)................................................................................................12

*Wesberry v. Sanders*,
   376 U.S. 1 (1965)..............................................................................................11, 12

*White v. Regester*,
   412 U.S. 755 (1973)..................................................................................... *passim*

*Williams v. North Carolina*,
   No. 3:17-CV-265, 2017 WL 4936429 (W.D.N.C. Oct. 2, 2017) .................... *passim*

*Williams v. Rhodes*,
   393 U.S 23 (1968)..........................................................................................6, 13, 19

*Williams v. Virginia State Bd. of Elections*,
   288 F. Supp. 622 (E.D. Va. 1968) *aff'd,* 393 U.S. 320 (1969) .......................1, 8, 12

**Statutes**

Mᴀss. Gᴇɴ. Lᴀws C. 53, §8................................................................................................14

Mᴀss. Gᴇɴ. Lᴀws C. 54, §43..........................................................................................2, 14

MASS. GEN. LAWS C. 54, § 78 ........................................................................................10

**Other Authorities**

First Amendment ...................................................................................................1, 19, 20

Fourteenth Amendment ...................................................................................... *passim*

Fed. R. Evid. 201(b)...................................................................................................3

Letter from Thomas Jefferson to James Monroe (Jan. 12, 1800) *in* 31 The Papers
    of Thomas Jefferson 300-01 (Barbara Oberg ed., 2005) ...........................................8

Senator Thomas Hart Benton, *Thirty Years' View*, Vol. I (1854)....................................8

U.S. Const. art. II, § 2, cl. 2 ........................................................................................10

U.S. Const. art. III.....................................................................................................3

# INTRODUCTION

In Massachusetts, the vote for President proceeds in two steps. *See* Compl. ¶¶ 4, 13-14, 54. First, the people cast their votes for individuals whose names appear as candidates for President. Second, the votes are tallied and Massachusetts awards to the political party of the prevailing candidate, regardless of margin, all of the Commonwealth's Electors. As Defendants observe, the Constitution grants the States wide leeway in allocating its Electors. Massachusetts could decide to hold no popular vote at all. But having made its choice, the election of course must be conducted in a Constitutional manner. *See Bush v. Gore*, 531 U.S. 98, 104 (2000) (citing *McPherson v. Blacker*, 146 U.S. 1, 35 (1892)); *Harper v. Virginia,* 383 U.S. 663, 665 (1966). Here it is not. Massachusetts' winner-take-all method for counting votes in Presidential elections ("WTA") violates the Fourteenth Amendment principle of "one person, one vote" and the free speech and associational rights of Massachusetts voters under the First Amendment.

Defendants' first contend that voters who allege that their ballots are systematically discarded lack standing. Plaintiffs easily clear the standing bar. *See infra* at 3–7.

Next, Defendants argue this is an easy case because history and Supreme Court precedent dictate the result. First, the State argues dismissal is commanded by the historical pedigree of WTA. But time alone does not answer the question of constitutionality. Further, the history of WTA shows that its adoption predated the very doctrinal principles on which Plaintiffs rely, and nothing in that history suggests it is constitutional. Indeed 'tradition' has often served to obscure, but never to excuse, injustice. Likewise, the precedent on which the State relies, in particular *Williams v. Virginia State Bd. of Elections*, 288 F. Supp. 622 (E.D. Va. 1968) *aff'd,* 393 U.S. 320 (1969), analyzed electoral systems distinct from WTA in Massachusetts, and failed to address the very arguments Plaintiffs here bring to demonstrate the unconstitutionality of

WTA.  These arguments ignore, among other things, the fundamental shifts marked by *White v. Regester*, 412 U.S. 755, 769 (1973), and *Bush v. Gore*'s elimination of any requirement that plaintiffs allege, much less prove, invidious intent.  *See infra* at 12–13.

When they should be turning to the merits, Defendants instead lean in to sophistry and legal fictions.  The State pretends voters cast ballots only for Presidential *Electors*, not for *President*, thereby seeking to avoid the applicability of *Gray v. Sanders*, 372 U.S. 368 (1963).  Someone should tell the people, who are barred by law from even *seeing* the names of the Electors on the ballots cast.  MASS. GEN. LAWS C. 54, §43.  The identity of an Elector, pledged to vote for its party, is of no more significance than the serial number of a voting machine—and their actions are equally mechanistic.  Grounding constitutional analysis in a transparent fiction of convenience is an invitation to error.  WTA is what it is: a two-step voting system indistinguishable from the one struck down in *Gray v. Sanders*.  *See infra* at 14–16.

But even if the 'Elector Election' fiction is indulged, WTA still violates the Equal Protection Clause of the Fourteenth Amendment.  Under Defendants' theory, Massachusetts' Presidential elections constitute a multi-member at-large election for Electors.  But the state may not dilute the votes of political minorities by wasting their votes in at-large, multi-member elections in which the majority runs the table.  *White*, 412 U.S. at 769.  If the Defendants' theory were correct, Massachusetts could elect its entire state legislative body through one statewide vote for a slate of Democrats.  But under Supreme Court precedent, such a scheme violates one person, one vote.  *See id.*  For the same reasons, WTA—even if the Court accepts the Elector Election fiction—also violates one person, one vote.  *See infra* at 16–18.

Finally, Defendants' arguments concerning Plaintiffs' First Amendment claim are similarly flawed.  The First Amendment affords voters the right to an equal and effective vote.

*See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 216 (1986) (finding that the First Amendment grants the right to voice one's preference "at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community."). WTA violates this right by weighting votes differently, depriving voters affiliated with minority parties a meaningful opportunity to associate. Defendants argue that nothing prevents Plaintiffs from voting for their candidate of choice, but, again, Defendants ignore that almost half of the votes cast for President in Massachusetts are discarded in the direct election, when it is most important that they be counted: such voters may have a right to cast a ballot, but they are deprived of their right to have their vote counted; they get the form, but not the substance, of the right to vote. *See infra* 19–20.

Plaintiffs respectfully oppose Defendants' motion to dismiss the Complaint.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court "must accept as true the factual allegations of the complaint and draw all reasonable inferences in favor of [plaintiff]." *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001). A court may give judicial notice to facts that are not the subject of reasonable dispute. Fed. R. Evid. 201(b).

## ARGUMENT

## I.   PLAINTIFFS HAVE STANDING TO BRING THESE CLAIMS

Defendants argue that the court should dismiss Plaintiffs' claims for lack of Article III standing. Defs.' Mot. Dismiss at 4. Plaintiffs have standing if (1) they have "suffered an injury in fact" that (2) is "fairly… trace[able] to the challenged action of the defendant" and (3) will

"likely" be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992) (internal citations omitted).  Defendants have not challenged the "traceability" of Plaintiffs' injury to WTA because Plaintiffs have indisputably alleged traceability.  *See e.g.*, Compl. ¶¶ 5, 7, 17-20, 43.  Plaintiffs have satisfied the other two requirements as well.

A.     **Plaintiffs Have Alleged a Concrete and Particularized Injury**

Plaintiffs allege that their votes have been discarded and diluted, and will continue to be discarded and diluted, through WTA (Compl. ¶ 17), satisfying the injury-in-fact requirement.

The Supreme Court has held that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  A voter alleges a concrete and personal injury where, as here, the voter is a resident of the relevant voting area and alleges that state law works to dilute or discard his vote.  *Baker v. Carr*, 369 U.S. 186, 206 (1962) (finding "voters who allege facts showing disadvantage to themselves as individuals have standing to sue.").  "Injury in fact" only requires that a person be "adversely affected," which "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem."  *United States v. SCRAP*, 412 U.S. 669, 690 n.14 (1973).

Plaintiffs allege here that their personal votes have been discarded and the power of those votes diluted.  This is a particularized and concrete injury.  *Reynolds*, 377 U.S. at 566 (holding "[d]iluting the weight of votes" by elevating one group's votes over another causes a cognizable injury).  Contrary to Defendants' claim that Plaintiffs lack standing because "that alleged injury may apply to any voter in the Commonwealth," Defs.' Mot. Dismiss at 6, Plaintiffs' right to seek redress of its injuries exists regardless of whether there are other similarly situated voters whose

votes suffered the same fate.  *See Baker*, 369 U.S. at 208 (finding plaintiff voters have standing because "if such impairment [of votes] does produce a legally cognizable injury, they are among those who have sustained it.").  The key element present here is that Plaintiffs "are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of *their* votes[.]'"  *See id.* at 206 (emphasis added) (internal citation omitted).  That element distinguishes Plaintiffs' claims from those in the cases Defendants cite, in which voters pursued injuries *other than* the dilution or discarding of their personal votes.[1]

Plaintiffs' First Amendment claims also assert a concrete and particularized harm. Plaintiffs allege WTA deprives them of their right of political association, limiting their ability to join together and express political preference through meaningful votes.  *See* Compl. ¶¶40–45. As described in *Gill v. Whitford*, a voter can allege sufficient injury by alleging the voting system "has burdened the ability of like-minded people across the state to affiliate in a political party and carry out that organization's activities and objects," and that if "the valued association and the injury to it are statewide, so too is the relevant standing requirement."  No. 16-1161, 2018 WL 3013807, at *21 (U.S. June 18, 2018) (J. Kagan, concurring) (noting "associational harm" of a voting system is "distinct from vote dilution[,]" and "[b]y placing a state party at an enduring electoral disadvantage, the gerrymander weakens its capacity to perform all its functions.").[2]

---

[1] *See* Defs.' Mot. Dismiss at 6–7 (citing *Crist v. Comm'n on Presidential Debates,* 262 F.3d 193 (2d Cir. 2001) (challenging exclusion of candidate from debates); *Becker v. FEC,* 230 F.3d 381, 389 (1st Cir. 2000) (challenging corporate sponsorship of debates); *Berg v. Obama,* 586 F.3d 234(3d Cir. 2009) (challenging eligibility of candidate); *Collins v. Merrill,* No. 16-cv-9375, 2016 WL 7176651 (S.D.N.Y. Dec. 7, 2016) (challenging Electoral College result inconsistent with popular vote); *Fischer v. Cruz,* No. 16-cv-1224, 2016 WL 1383493 (E.D.N.Y. Apr. 7, 2016) (challenging eligibility of candidate); *Jones v. Bush,* 122 F. Supp. 2d 713, 716 (N.D. Tex.), *aff'd,* 244 F.3d 134 (5th Cir. 2000) (challenging Electors voting for candidates from same state); *Froelich v. FEC,* 855 F. Supp. 868, 869 (E.D. Va. 1994), *aff'd,* 57 F.3d 1066 (4th Cir. 1995) (challenging campaign contributions from nonresidents).

[2] *Gill* also supports finding standing for a vote dilution claim.  No. 16-1161, 2018 WL 3013807, at *14. (finding plaintiffs lack standing for vote dilution claims where the alleged effects are only in electoral units in which they do not reside and vote).  Since Plaintiffs here allege injury with regard to voter dilution in a statewide vote, they, unlike the Plaintiffs in *Gill*, meet the requirement of having their personal votes diluted by the challenged statewide system.

B.    **Plaintiffs' Alleged Injury Will Be Redressed By a Favorable Ruling**

Defendants argue redressability is not met because (1) the States have plenary power over how Electors are chosen, and (2) a favorable resolution to this dispute would not redress Plaintiffs' alleged injury.  The former ignores that the power of the States does not supersede the federal government's ability (and responsibility) to protect constitutionally guaranteed rights, and the latter is a straw man argument that mischaracterizes the actual injury alleged.

Defendants assert that "the Constitution confers plenary authority on state legislatures … to determine how to select Electors[.]"  Defs.' Mot. Dismiss at 7. This exact argument of absolute, unqualified state power was rejected by the Supreme Court in *Reynolds*:

> We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and mathematical quagmires. **Our answer is this: a denial of constitutionally protected rights demands judicial protection**; our oath and our office require no less of us.

377 U.S. at 566 (emphasis added); *see also Williams v. Rhodes*, 393 U.S 23, 29 (1968) ("[P]owers [granted to the States] may not be exercised in a way that violates other specific provisions of the Constitution.").

Defendants also argue that the relief Plaintiffs request will not redress the alleged injury, as other states may continue to have winner-take-all systems in place.  In making this argument, Defendants ignore the injury alleged, which is: "because the Plaintiffs have voted for, and will vote for, the Republican, Libertarian, or other non-Democratic candidate for President in Massachusetts, they have been, and will be again, deprived of the right to have their votes counted equally and meaningfully toward the election of the President."  Compl. ¶ 17.  *See also* Compl. ¶ 7.  This injury is caused by WTA in *Massachusetts*, and would be remedied by an

injunction preventing "Defendants from selecting Electors under the challenged WTA system, or any other system that fails to treat each Massachusetts citizen's vote for the President in an equal manner including selection by Congressional District vote."  Compl. ¶ 60(c).[3]

Due to WTA, Plaintiffs have been personally injured because their votes for President are discarded and diluted to zero effect, while the votes of Democratic-voting citizens are amplified far beyond their numbers.  Plaintiffs have standing because that injury is indisputably "traceable" to WTA and would be "redressed" by a favorable decision striking down WTA.

## II.    PLAINTIFFS' CLAIMS ARE NOT FORECLOSED BY HISTORICAL FACT OR LEGAL PRECEDENT

### A.    History Does Not Resolve the Constitutionality of WTA

Defendants argue that WTA survives constitutional scrutiny because states have widely employed it for over two centuries.  Defs.' Mot. Dismiss at 4, 9.[4]  The very same arguments were used to justify adherence to what we now recognize as some of the most abhorrent practices (both electoral and otherwise) that our courts have set aside.   "When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed."  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015); *see also* Compl. ¶¶ 4,5, 9, 50, 51 (alleging that WTA's effect is increasingly problematic because it systematically dilutes and discards votes, subverts the influence of Massachusetts voters, and renders elections

---

[3] Relatedly, Defendants suggest in passing that Plaintiffs may not seek redress of violations of their constitutional rights in Massachusetts unless they pursue such relief *everywhere*.  *See* Defs.' Mot. Dismiss at 8 (citing *Williams*, 288 F. Supp. at 629).  As an initial matter, there is no support for the idea that a plaintiff must suffer violation of her constitutional rights because *other states* are also violating the rights of *their* citizens.  More troublingly, acceptance of such an argument could raise an insurmountable barrier to Plaintiffs *ever* remedying constitutional violations, no matter how clearly those violations were proved or alleged.  Defendants have challenged, incorrectly, Plaintiffs' standing to bring claims in this case; there is little question other states (in which Plaintiffs have never voted nor plan ever to vote) would challenge Plaintiffs' standing to sue *those* states.

[4] Defendants also argue that "the States have plenary authority to determine the method of selection of Presidential Electors, and States have exercised their broad authority over the past 230 years[.]" Defs.' Mot. Dismiss at 9.  But, as discussed *supra* at I.B, a State cannot, in the exercise of its power, violate federal rights.

vulnerable to attack).  Even accepting that history can sometimes inform constitutional analysis, however, WTA's history only serves to explain why the system fails to meet modern conceptions of voter equality—winner-take-all simply became widespread *before* the Fourteenth Amendment was ratified and *before* modern notions of voter equality had ever even been developed.

The real history of WTA renders the State's appeal to 'tradition' particularly unattractive. Defendants are correct that, by 1832, every state but one had adopted some form of winner-take-all.  Defs.' Mot. Dismiss at 10.  But winner-take-all was not implemented to ensure voter equality.  Quite the opposite.  This stratagem was designed and adopted to maximize the influence of a state's majority party and cancel out the voting strength of everyone else.[5]  Such a policy decision to overweight votes for political convenience is simply not tenable under modern voting rights jurisprudence.  *See, e.g.*, *Gray*, 372 U.S. at 381 n.12; *California Democratic Party v. Jones*, 530 U.S. 567, 582 (2000); *McCutcheon v. Federal Election Comm'n.*, 134 S. Ct. 1434, 1450 (2014) ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment") (internal citation omitted).[6]

Since the widespread adoption of winner-take-all, there have been dramatic changes to the applicable legal landscape.  Most importantly, the United States adopted the Fourteenth

---

[5] *Williams*, 288 F. Supp. at 628 ("The legislature of the Commonwealth had the choice of appointing electors in a manner which will fairly reflect the popular vote… or to allow the majority to rule and thereby maximize the impact of Virginia's 12 electoral votes in the electoral college tally."); *see also* Senator Thomas Hart Benton, *Thirty Years' View*, Vol. I, at 38 (1854) ("The general ticket system … was the offspring of policy, and not of any disposition to give fair play to the will of the people.  It was adopted … to enable [the majority] to consolidate the vote of the State.").

[6] Defendants point out that Thomas Jefferson advocated for the general ticket in Virginia in 1800.  Defs.' Mot. Dismiss at 10. This was pure politics.  He recorded for history that the general ticket guaranteed that a "minority is entirely unrepresented[,]" and he advocated for it to prevent the antifederalists from losing another election.  *See* Letter from Thomas Jefferson to James Monroe (Jan. 12, 1800) *in* 31 The Papers of Thomas Jefferson 300-01 (Barbara Oberg ed., 2005).  The other states that soon followed suit did so for the same reason: to maximize the power of their own dominant voting blocs.

Amendment in 1868, over three decade after Massachusetts adopted WTA.  In the 1960s and 1970s—130 years after winner-take-all became widespread—the Court began to apply the Fourteenth Amendment to scrutinize, and in some cases enjoin, state electoral processes, on the basis of the one person, one vote principle articulated by the Supreme Court in *Gray*.  372 U.S. at 381; *id* at 377 n. 8 ("Passage of the Fifteenth, Seventeenth, and Nineteenth Amendments shows that [the] conception of political equality [prevalent in the Founding era] belongs to a bygone day, and should not be considered in determining what the Equal Protection Clause of the Fourteenth Amendment requires in statewide elections."); *White*, 412 U.S. at 769 (holding that a Texas County's use of an at-large election for multiple elected officials violated the Fourteenth Amendment).  Thus, what is now a bedrock principle of constitutional law was not even in place during the majority of the historical period upon which the Defendants rely.[7]

> **B.     Defendants' Cited Precedent Does Not Address the Legal Questions Presented by Plaintiffs' Claims and Predates Important Doctrinal Shifts**

Defendants also argue that previous decisions by the Supreme Court foreclose Plaintiffs' challenge.  Defs.' Mot. Dismiss at 11–12.  But in *not one* of the cases Defendants cite did the court address Plaintiffs' central factual and legal argument here: when a state presents its election as one for President, and *not* as one for Electors, its election must comport with constitutional protections that necessarily govern two-step elections.  *See infra* at 13–16.  In addition, even to the degree *Williams* addresses any argument of relevance in this case, Defendants' reliance on the summary affirmance in *Williams* is misplaced, as it no longer holds in the face of factual and

---

[7] Defendants' citation to cases like *Noel Canning* is inapt; they hold that settled practice can "liquidate" the meaning of specific constitutional provisions—in particular when the provisions are ambiguous, and when the adopters of the practice understood it to be consistent with the provisions under review.  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014).  However, as discussed above, winner-take-all was widespread *before* the ratification of the Equal Protection Clause—and long before the advent of the one person, one vote principle in the 1960s—and thus cannot liquidate the meaning of those principles nor contextualize their application.

doctrinal shifts in the one person, one vote jurisprudence.

Defendants first rely on *McPherson,* 146 U.S. at 36, to establish that the Supreme Court has purportedly already accepted winner-take-all. Defs.' Mot. Dismiss at 3–5.[8]  But the Court in *McPherson* did not address if allocating all of a state's Presidential Electors to the Presidential candidate that received the most votes violated the Equal Protection Clause of the Fourteenth Amendment (much less the one person, one vote principle articulated *70 years later*).  Plaintiffs in *McPherson* challenged district-by-district elections for Electors, asking the Court to determine if the Constitution *required* a state-wide election for all Electors.  The Court concluded it did not. *McPherson,* 146 U.S. at 24-25, 38.  Specifically, the Court rejected that Art. II, § 2, cl. 2 of the Constitution foreclosed a district level vote for Electors, *id.* at 27-36, or that the Fourteenth Amendment created a right for each citizen of a state to vote for *each* Elector, *id.* at 39.

Defendants' argument that *Williams* controls is similarly flawed.  In *Williams*, a district court assessed, and dismissed, a challenge to a winner-take-all system for allocating Electors, and the Supreme Court summarily affirmed.  As an initial matter, Defendants cite *Mandel v. Bradley*, 432 U.S. 173, 176 (1977), for the proposition that the Supreme Court's summary affirmance in *Williams* is binding.  Defs.' Mot. Dismiss at 13.  But *Mandel* makes clear that courts looking to apply summary affirmances must closely analyze the factual and legal issues presented to determine if they are identical.  *Mandel*, 432 U.S. at 176.  Here they are not.  The district court's decision in *Williams* does not address Plaintiffs' primary constitutional claim: that a state may not discard votes *for the President* through WTA in the same manner that, in

---

[8] While Defendants present WTA as virtually identical to the "general ticket" system to which the Court referred to in *McPherson*, the two retain crucial distinctions.  The prevailing general ticket system in the late-nineteenth century was, for one, an election of Electors, in which voters cast votes for individual Electors.  And "general ticket" meant only that voters had the *option* of selecting all Electors from a given party with one notation on the ballot, if they so desired. Voters under WTA vote only for a Presidential candidate, which is then counted as a vote for each of that political party's 11 Presidential Elector nominees. See MASS. GEN. LAWS C. 54, § 78.

*Gray*, votes were discarded at an intermediate step in a two-step election.  The absence of such legal analysis is no surprise because *Williams* addressed winner-take-all under a system and time, like in *McPherson*, when voters cast their vote for Electors.  *See* Ex. A at 4 (Plaintiffs' brief on the merits in *Williams*, describing the Virginia ballot)[9]; *see also McPherson*, 146 U.S. at 1, 4 (quoting Act No. 50 of the Public Acts of 1891 of Michigan)). Moreover, this was a time when Electors were not bound to the vote of the people. *See* 2001 Va. HB 1853 (changing the Virginia statute in 2001 so that Electors are "required to vote" for the party's nominee).

Further, neither *Williams,* nor Supreme Court precedent preceding it, holds that winner-take-all in a two-step election for President is constitutional.[10]  Defendants argue that the dicta from *Wesberry v. Sanders*, 376 U.S. 1, 8 (1965), discussed by the *Williams* district court, held that *all* winner-take-all methods are "automatically" constitutional, and Defendants thereby suggest the summary affirmance in *Williams* may be similarly construed.  *See* Defs.' Mot. Dismiss at 12–13.  But the Supreme Court in *Wesberry* could not have concluded that the two-step election process it had condemned as violating the principle of one person, one vote only the year before in *Gray*, 372 U.S. at 370–71, was in fact "automatically" constitutional in *Wesberry*.

---

[9] *Mandel*, 432 U.S. at 176, also makes clear that courts reviewing summary affirmances should not read the lower court's *rationale* as controlling, just the narrow final judgment. *Id.* This is especially true when the district court presents two rationales for upholding the judgment as the *Williams* court did—one of which, as noted, relied *dispositively* on the specific way Virginia elected *Electors*—which is materially different from Massachusetts' method.  *Williams*, 288 F. Supp. at 627–28 (upholding Virginia's electoral system because it was difficult for the court to see how votes for Electors were treated unequally, *and* because it found that the system resembled the election of Representatives, which the Supreme Court stated in *Wesberry*, 376 U.S. at 8, was constitutional and which Congress had "expressly countenanced"); *see also Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983).

[10] For the same reasons, Massachusetts also incorrectly relies on the Supreme Court's summary affirmance in *Graham v. Fong Eu*, 403 F. Supp. 37, 45 (N.D. Cal. 1975) *summarily aff'd*, 423 U.S. 1067 (1976).  Defs.' Mot. Dismiss at 16,19.  *Graham* reviewed an *intraparty* primary dispute.  *See Buckley v. Valeo*, 424 U.S. 1, 250 (1976) (citing *Graham* as a case involving an "intraparty dispute").  As the Supreme Court has repeatedly affirmed, courts view such challenges through fundamentally different—and far more lenient—constitutional standards.  *See, e.g.*, *Public Integrity All., Inc. v. Tucson*, 836 F.3d 1019, at 1026–27 (9th Cir. 2016) (citing "decades of jurisprudence permitting voting restrictions in primary elections that would be unconstitutional in the general election." (collecting cases)).

*See infra* at 14–15.  Such a holding would mean the summary affirmance in *Williams* broke important new ground, which stretches the opinion far beyond what it can bear.  *Mandel*, 432 U.S. at 176 (holding "a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below.").

Further compromising any argument based on *Williams* are important doctrinal shifts. Even if the Court were to embrace the fiction that WTA should be viewed as a one-step election of an at-large, multi-member body, *see infra* at 14, the summary affirmance in *Williams* does not control.  *Wesberry* and *Williams* were decided before *White v. Regester* struck down use of a multi-member at-large election system.  412 U.S. at 768.  *White* fundamentally shifted the legal landscape by striking down a multi-member at-large election that operated to dilute minority votes. *See infra* 17–18. Moreover, the portion of the lower court's decision in *Williams* that Defendants rely on—"in a democratic society the majority must rule, unless the discrimination is invidious" (288 F. Supp. at 627)—is no longer good law.  *Bush* dispensed with invidiousness—at least as that term was understood at the time of *Williams*[11]—as a necessary element of a one person, one vote claim.  531 U.S. at 104–05.  In its place, the Court stated that "the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another," and "the idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Id.* (internal citation omitted).  Absent was any suggestion that a finding of invidiousness was necessary to the Court's finding.  Later cases support this reading of *Bush. See e.g., Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (rejecting that an election-related violation of the Equal Protection

---

[11] "Invidious discrimination" at the time of *Williams* entailed some level of "intentional" or "purposeful" discrimination.  *See Washington v. Davis*, 426 U.S. 229, 242 (1974) ("[A]n invidious discriminatory *purpose* may often be inferred from the totality of the relevant facts....").

Clause always requires intentional discrimination).[12]

In short, neither history nor precedent saves WTA from constitutional invalidation under the Equal Protection Clause.[13]

## III.   WTA VIOLATES "ONE PERSON, ONE VOTE"

Under the Constitution, a state may decide in the first instance the manner in which it selects Electors, including by popular vote or by direct appointment by the legislature.  *Bush*, 531 U.S. at 104–05 (citing *McPherson*, 146 U.S. at 35).  When a state exercises that choice in favor of giving its citizens the right to vote for President, that right becomes a "fundamental" right to a vote of "equal weight" endowed with "equal dignity," and is subject to the Equal Protection Clause.  *Id.*; *see also Williams*, 393 U.S at 29.  The Fourteenth Amendment prohibits a state from discarding or diluting the votes of certain of its citizens, while magnifying others, unless that outcome is required by a specific constitutional provision.  *Gray*, 372 U.S. at 380–81; *Bush*, 531 U.S. at 104.  Here, WTA violates these principles, by discarding the votes of non-Democratic voters at an intermediate step in a two-step election for President.  *See Gray*, 372 U.S. at 379

---

[12] "Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional." *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002); *see also Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795, 835 (S.D. Ohio 2012) ("Plaintiffs must show only that the Board's actions resulted in the arbitrary and disparate treatment of the members of the electorate.") (citing *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011), which in turn cites *Bush*).

[13] The remaining cases that Defendants cite do not raise legal issues that have not already been addressed.  *See* Defs.' Mot. Dismiss at 11–13; *e.g., Delaware v. New York*, 385 U.S. 895 (1966) (declining to hear the case and issuing no relevant opinion); *Williams v. North Carolina*, No. 3:17-CV-265, 2017 WL 4936429, at *5 (W.D.N.C. Oct. 2, 2017), report and recommendation adopted, 2017 WL 4935858 (W.D.N.C. Oct. 31, 2017) (recommending dismissal of a pro se plaintiff's claims against the WTA system in part because "Plaintiff has not offered any cases or argument to rebut the application" of almost entirely the same list of cases raised in Defendants' motion here); *Conant v. Brown*, 248 F. Supp. 3d 1014, 1025 (D. Or. 2017) (dismissing a pro se plaintiff's challenge to a winner-take-all system because "Williams is still good law and Plaintiff offers no basis for distinguishing it."); *Schweikert v. Herring*, No. 3:16-CV00072, 2016 WL 7046845, at *2 (W.D. Va. Dec. 2, 2016) (same); *Hitson v. Baggett*, 446 F. Supp. 674, 675–76 (M.D. Ala 1978.), aff'd without opinion, 580 F.2d 1051 (5th Cir. 1978) (addressing the apportionment of Electors to the states and the constitutionality of popular elections for Electors, neither of which are challenged here); *Penton v. Humphrey*, 264 F. Supp. 250, 251–52 (S.D. Miss. 1967) (addressing the constitutionality of the Electoral College itself, and incorrectly finding that a  Supreme Court's denial of leave to file a bill of complaint in Delaware without any relevant opinion was a binding decision on the merits).

n.12.

### A.      Defendants Rely on a Fiction of Convenience

Defendants first argue that they do not discard votes for President because Massachusetts' voters do not vote for President in a two-step election, they vote for Electors, and each vote counts equally.  Defs.' Mot. Dismiss at 1, 15–16, 19.  But the actual practice of Presidential elections in Massachusetts belies the central premise underlying Defendants' argument—that Massachusetts voters vote for Electors and not a Presidential candidate.[14]  *See* Compl. ¶¶ 4, 13-14, 54.   Electors in Massachusetts are specifically *prohibited* from appearing on the ballot. MASS. GEN. LAWS C. 54, § 43.  Nor do they perform any functions requiring "reasonable independence and fair judgment," *McPherson*, 146 U.S. at 36; instead, they are bound to the candidate with a plurality of the people's votes, MASS. GEN. LAWS C. 53, §8.  The indisputable reality is this: people vote for the President and the states allocate Electors *solely* to consolidate and count those votes.[15]  To argue otherwise today is like arguing that voting machines cast votes, not the people who pull the lever.

### B.      Understood as a Presidential Election, WTA Violates One Person, One Vote

Because the election for President in Massachusetts is a two-step election, the Supreme Court's decision in *Gray v. Sanders* controls here.  In *Gray*, the Court reviewed Georgia's

---

[14] Indeed, Defendants attempt to equate Massachusetts' modern Presidential elections to the indirect democracy system used by states in the time of the Framers.  Defs.' Mot. Dismiss at 9-10.  That system was intended to ensure that the election of the President was *not* left "to the people," *Gray*, 372 U.S. at 377 n.8, and was instead given to an "intermediate body of electors" that would be "detached" from "cabal, intrigue, and corruption," *The Federalist Papers: No. 68* (Alexander Hamilton) (Mar. 14, 1788).  Today's reality is quite different.

[15] That Massachusetts' Presidential elections are not merely elections for Electors but rather elections for President is underscored by how everyone (voters, candidates, and Electors alike) participates in these elections.  Presidential candidates campaign for the votes *of the people*, not the votes of Electors.  Electors refrain from campaigning for votes altogether.  Presidential elections are publicly called and celebrated after the vote of the people in November, not after the vote of the Electors in December, and one would be hard pressed to find many voters who could recall the name of an Elector.

"deeply rooted and long standing" practice of allocating a set number of "units" to each county to consolidate and count the vote in that county in primary elections for statewide offices. *Gray*, 372 U.S. at 370–71, 76. All of a county's units were awarded via a winner-take-all county-wide vote, and the candidate who had the most units after a tally of all the county-level elections in the state won. *Id.* The Court struck down Georgia's system on the basis that it weighted rural votes more than urban votes. *Id.* at 379. The Court also held, however, that even if the state allocated a perfectly proportional number of units to each county, the system would still unconstitutionally weight certain votes because votes for a candidate who failed to win in a given county would be counted "only for the purpose of being discarded" before the final tally. *Id.* at 381 n.12.

WTA is indistinguishable from the system rejected in *Gray* in any material respect. As Georgia did in *Gray,* Massachusetts relies on a two-step process for counting votes, using WTA to consolidate and count the vote of the people at the first step. As in *Gray,* because of WTA, only the votes for the winning candidate matter in the second step when the final vote count occurs. And as in *Gray*, votes for a candidate who failed to win a plurality in the first step are thus counted "only for the purpose of being discarded" before the final tally. *Id.* Indeed, the Ninth Circuit has observed that "Georgia's primary election system [in *Gray*] was . . . similar to the electoral college used to elect our President." *Public Integrity*, 836 F.3d at 1025.

To the degree Defendants engage with this clear analogy, they argue *Gray* was a case about "geographical" discrimination, and Plaintiffs' case is not. Defs.' Mot. Dismiss at 17. As an initial matter, it is incorrect to say Plaintiffs have not alleged geographic discrimination: Massachusetts' WTA system operates to minimize the votes of non-Democratic voters *in Massachusetts* in exactly the way the *Gray* court condemned. Defendants' attempts to limit

15

*Gray*'s holding to discrimination between rural and urban voters has no basis in that decision. [16]

In any event, however, Plaintiffs do not need to allege geographic discrimination, as they have plausibly alleged discrimination on the basis of party affiliation—discrimination that was not at issue in *Gray*, an intraparty dispute. *See* Compl. ¶ 5. Defendants themselves cite case law that recognizes "the weight assigned to individual votes cannot depend on where individual voters live or whether they belong to identifiable … **political groups**." *See* Defs.' Mot. Dismiss at 16 (citing *Graham v. Fong Eu*, 403 F. Supp. 37, 45 (N.D. Cal. 1975)) (emphasis added). Plaintiffs here are members of minority political parties challenging WTA's discarding of their votes to magnify the voting power of Massachusetts's dominant political party. *Cf. Burns*, 384 U.S. at 88 (affirming that electoral systems cannot be used to "cancel out the voting strength of … political elements of the voting population") (internal citation omitted). That a state might use the tool of discrimination held unconstitutional in *Gray* to discriminate against political minorities, and not simply rural voters, does not render *Gray* inapplicable.

In short, having decided to treat its elections as one for *President*, Massachusetts cannot now avoid the clear implication of *Gray v. Sanders*—and its application of the one person, one vote principle—by disclaiming its own choice.[17]

## C. Misunderstood as an Elector Election, WTA Violates One Person, One Vote

---

[16] *Gordon v. Lance*, which described *Gray* as a case addressing "geographic discrimination," is not to the contrary. 403 U.S. 1, 5 (1971) (citing *Gray*, 372 U.S. at 381 n. 12). In *Gordon*, plaintiffs challenged a rule that required a threshold of 60% of the vote to create a new state debt. *Id.* at 2. The Supreme Court held *Gray* did not invalidate that threshold requirement—and *further* held that the requirement did not operate to discriminate against any defined political group. Plaintiffs in this case do not challenge a threshold requirement; they challenge a system that *does* operate to discriminate against a defined political group, and operates exactly like the system in *Gray*.

[17] Indeed, even as Defendants' motion hinges on the fiction that votes are cast for *Electors*, they consistently undermine their position by acknowledging that voters place their votes for *President*. *See e.g.,* Defs.' Mot. Dismiss at 2, 6, 19, 20. Sometimes even in the same breath. *See* Defs.' Mot. Dismiss at 16 ("Massachusetts's winner-take-all system readily satisfies that standard because it does not weigh **votes for Electors** differently depending on where a voter resides. Every vote cast **for Presidential Electors** in Massachusetts is given equal weight in determining **which Presidential candidate receives the most votes** and is awarded the State's slate of electors") (emphasis added).

Even viewing Massachusetts' Presidential election as one in which residents of Massachusetts only vote for Electors, WTA still fails to satisfy the requirements of equal protection that apply to at-large, multi-member elections, which Massachusetts' statewide election for its 11 Presidential Electors would be under this premise.

Defendants claim that a multi-member, at-large election for Electors "automatically" satisfies the Fourteenth Amendment because, in such a system, "each citizen has an equal right to vote, the same as any other citizen has." Defs.' Mot. Dismiss at 10–11 (citing *McPherson* and *Wesberry*). But as the Supreme Court has explained, "apportionment schemes including multi-member districts" are constitutionally invalid "if it can be shown that 'designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of … political elements of the voting population.'" *Burns*, 384 U.S. at 88 (quoting *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965)); *see White*, 412 U.S. at 769 (finding a multi-member, at-large election scheme unconstitutional). The Court later recognized the "right to vote can be affected by a dilution of voting power" through the adoption of at-large voting schemes just as much as "by an absolute prohibition on casting a ballot." *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969) (abrogated on other grounds by *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017)). Here, Plaintiffs allege that Massachusetts' system unconstitutionally cancels out the voting strength of political minorities. *See* Compl. ¶¶ 45–53. This dilution of votes in an at-large, multi-member election violates the Constitution.

Applying this standard in 1973, the Supreme Court in *White v. Regester* invalidated a multi-member districting scheme because Mexican-Americans were "effectively removed from the political processes" of a Texas county because their votes were submerged into an at-large pool with a majority that was likely to multiply its voting power. 412 U.S. at 769. The scheme

17

the Supreme Court held was unconstitutional in *White* is indistinguishable from Defendants' own

characterization of WTA—a statewide, at-large election for Massachusetts' 11 Presidential

Electors, in which political minorities have little to no chance of being represented by even one

Elector.  Indeed, Massachusetts has selected 95 Electors in the last eight elections, and *all* were

members of the Democratic party, notwithstanding the 9,619,746 votes for non-Democratic

candidates over that time.  Compl. ¶¶ 5–7, 13.  If translating millions of non-Democratic votes

into zero representation does not "cancel out the voting strength" of non-Democratic voters, then

it is difficult to know what would meet the constitutional standard for dilution.

  In fact, if Massachusetts had authorized this type of election for any other multi-member

body of elected officials, it would be obvious that it violated the Constitution.  For instance,

Massachusetts could not constitutionally abolish its 40 single-member state senate districts and

instead hold a statewide election for all of its senators by letting voters choose whether they

wanted that body to be composed entirely of Democratic or Republican Senators.  Such a scheme

would *always* result in one-party rule with all 40 state senate seats awarded to the party receiving

a plurality of the votes.  This hypothetical state senate scheme would violate one person, one

vote because it deliberately cancels out the voting strength of political minorities in the state.

For the same reasons, WTA violates one person, one vote too.[18]  *See Burns*, 384 U.S. at 88.

  Defendants argue Plaintiffs' claims fail because the Fourteenth Amendment does not

require proportional representation.  Defs.' Mot. Dismiss at 17–19.  This argument is a straw

man.  First, Plaintiffs' primary request for relief is that the Court rule WTA unconstitutional and

order that Massachusetts adopt a constitutional method.  It is only if Massachusetts fails to do so

---

[18] This analysis necessarily applies to multi-member elections only, not to single-member elections.  Even though many votes are "discarded" in the election of Governor, it is constitutionally acceptable because the election is for a single statewide office.  But here, continuing with the premise Massachusetts holds a statewide election for 11 Electors, it must use a method of election that does not dilute the votes of millions of citizens.

that the Plaintiffs request the Court impose a remedy.  Second, whether the Constitution requires

fully "proportional representation" in any given electoral context is not the issue.  Defendants

cannot justify a patently unconstitutional system by noting that the Supreme Court has, in other

contexts, stated that a maximally-proportionate representative body was not required.

## IV.     WTA VIOLATES PLAINTIFFS' RIGHT TO FREEDOM OF ASSOCIATION

WTA not only implicates Fourteenth Amendment rights, it also burdens Plaintiffs' First

Amendment rights, requiring heightened scrutiny by the Court.  *Employment Div., Dept. of*

*Human Res. v. Smith*, 494 U.S. 872, 881 (1990) (recognizing that heightened scrutiny applies

when more than one constitutional claim is at issue (termed a "hybrid" claim)).  When

determining whether a state election law violates First and Fourteenth Amendment associational

rights, a court must weigh the "'character and magnitude'" of the burden the State's rule imposes

on those rights against the interests the State contends justify that burden and consider the extent

to which the State's concerns make the burden necessary.  *Burdick v. Takushi*, 504 U.S. 428, 434

(1992) (quoting *Anderson*, 460 U.S. at 789).  Here, Plaintiffs adequately allege constitutional

harms, yet Defendants fail to advance *any* state interest.

The Complaint alleges that WTA burdens the political association rights of minority

party voters by discarding, or at the very least diluting, the votes of minority party members and

magnifying the impact of majority party votes, *see e.g.,* Compl. ¶¶ 14, 43-45.  As the Supreme

Court has recognized, membership in a political party means little if the members of that party

are denied an equal, full, and effective opportunity to participate in the political process.  *Rhodes*,

393 U.S. at 31; *Reynolds*, 377 U.S. at 565 (noting that "each and every citizen has an inalienable

right to *full and effective* participation in the political process") (emphasis added).  Under WTA,

votes are discarded "at the crucial juncture at which the appeal to common principles may be

translated into concerted action, and hence to political power in the community." *Tashjian*, 479 U.S. at 216.  In short, WTA eliminates all practical opportunity for non-dominant party voters in Massachusetts, including Plaintiffs here, to effectively voice their preference for President.[19]

Defendants argue there is no burden on First Amendment rights because WTA does not "limit[] candidates' access to the ballot and thereby limit[] plaintiffs' ability to express their political preferences."  Defs.' Mot. Dismiss at 20.  But the Constitution provides Massachusetts voters a *full and effective* right to vote—not simply a symbolic opportunity to express their views as uncounted votes thrown into the void.  That WTA does not *entirely* deprive members of minority parties of the opportunity to vote does not make it constitutional.  *See Kusper v. Pontikes*, 414 U.S. 51, 58 (1973) (restriction on primary voting violated the First Amendment even though it did not "deprive [voters] of all opportunities to associate with the political party of their choice").  Instead, the inquiry concerns the manner and degree to which the regulation burdens the "prime objective" of associating with others in the exercise of political power.  *Id.*

Defendants otherwise make no attempt to justify WTA, let alone identify a state interest that outweighs the WTA-created burden the Complaint alleges on Plaintiffs' First Amendment associational and expressive rights.[20]

---

[19] This "burden is especially great for individuals who do not have ready access to alternative avenues for supporting their preferred politicians and policies[,]" *McCutcheon*,134 S. Ct. at 1449, *i.e.* individuals who lack the wealth to participate in national politics not by associating and voting, but by donating money to candidates. This is especially true here, where the WTA incentivizes candidates to focus only on battleground states that do not include Massachusetts, thereby limiting the chance of Massachusetts voters to exercise their First Amendment rights.  The Supreme Court has held that such inventive structures violate the First Amendment.  *See, e.g.*, *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 733, 755 (2011) (noting that Arizona's system by which publically funded candidates received funding from the state when privately financed candidates spent additional funds incentivized candidates to spend less money on their own races—just as Plaintiffs here allege candidates are incentivized to ignore, and thus not associate with, Massachusetts voters).

[20] Even if any such state interests were identified, they would be entitled to less deference than usually accorded to states in regulating elections because "the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Anderson*, 460 U.S. at 795.

# CONCLUSION

For the reasons stated above, Defendants' motion to dismiss should be denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiffs requests oral argument on this motion because

Plaintiffs believe that oral argument may assist the Court in its consideration of this motion.

Dated: June 25, 2018                          Respectfully submitted,

By:____/s/ Seth V. Jackson
Seth V. Jackson, Esq., BBO # 658669          David Boies (*Pro Hac Vice* to be filed)
ZELLE LLP                                    BOIES SCHILLER FLEXNER LLP
161 Worcester Road, Suite 502                333 Main Street
Framingham, MA  01701                        Armonk, NY 10504
Telephone:  (781) 466-0700                   Telephone:  (914) 749-8200
Facsimile:  (781) 466-0701                   Facsimile:  (213) 629-9022
sjackson@zelle.com                           DBoies@bsfllp.com


Matt Herrington (*Pro Hac Vice* pending)      James P. Denvir, III (*Pro Hac Vice* to be filed)
Roger E. Warin (*Pro Hac Vice* pending)       Amy J. Mauser (*Pro Hac Vice* to be filed)
Joe R. Caldwell, Jr. (*Pro Hac Vice* pending) Karen L. Dunn (*Pro Hac Vice* to be filed)
Zachary B. Schreiber (*Pro Hac Vice* pending) Lisa Barclay (*Pro Hac Vice* to be filed)
STEPTOE & JOHNSON LLP                         Amy L. Neuhardt (*Pro Hac Vice* to be filed)
1330 Connecticut Avenue, N.W.                 Hamish P.M. Hume (*Pro Hac Vice* to be filed)
Washington, D.C.  20036                       Samuel G. Hall (*Pro Hac Vice* to be filed)
Telephone:  (202) 429-3000                    BOIES SCHILLER FLEXNER LLP
Facsimile:  (202) 429-3902                    1401 New York Avenue, N.W.
mherrington@steptoe.com                       Washington, D.C.  20005
rwarin@steptoe.com                            Telephone: (202) 237-2727
jcaldwell@steptoe.com                         Facsimile: (202) 237-6131
zschreiber@steptoe.com                        JDenvir@BSFLLP.com
                                              AMauser@BSFLLP.com
                                              KDunn@BSFLLP.com
David H. Fry (*Pro Hac Vice* to be filed)      LBarclay@BSFLLP.com
Benjamin W. Schrier (*Pro Hac Vice* to be filed) ANeuhardt@BSFLLP.com
J. Max Rosen (*Pro Hac Vice* to be filed)      HHume@BSFLLP.com
MUNGER, TOLLES & OLSON LLP                    Shall@ BSFLLP.com
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100                     Scott A. Martin (*Pro Hac Vice* to be filed)

21

Facsimile: (213) 687-3702
david.fry@mto.com
benjamin.schrier@mto.com
max.rosen@mto.com

Jennifer D. Hackett (Admitted *Pro Hac Vice*)
James R. Martin (Admitted *Pro Hac Vice*)
Allison M. Vissichelli (Admitted *Pro Hac Vice*)
ZELLE LLP
1775 Pennsylvania Avenue, N.W., Suite 375
Washington, D.C.   20009
Telephone:  (202) 899-4100
Facsimile:  (202) 899-4102
jhackett@zelle.com
jmartin@zelle.com
avissichelli@zelle.com

James D. Gotz, Esq. BBO #567157
HAUSFELD LLP
One Marina Park Drive
Suite 1410
Boston, MA 02110
Telephone: (617) 207-0600
Facsimile: 617-830-8312
jgotz@hausfeld.com

 Randall L. Allen (*Pro Hac Vice* to be filed)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone:  (404) 881-7196
Facsimile:  (404) 253-8473
Randall.Allen@alston.com

María Amelia Calaf (Admitted *Pro Hac Vice*)
Jack A. Simms, Jr. (Admitted *Pro Hac Vice*)
Ryan A. Botkin (Admitted *Pro Hac Vice*)
Katherine P. Chiarello (Admitted *Pro Hac Vice*)
Karen S. Vladeck (Admitted *Pro Hac Vice*)
W. Reid Wittliff (Admitted *Pro Hac Vice*)
 WITTLIFF | CUTTER | AUSTIN, PLLC
1803 West Ave.

Irving Scher (*Pro Hac Vice* to be filed)
Jeanette Bayoumi (*Pro Hac Vice* to be filed)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646)357-1100
Facsimile: (212)202-4322
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

Michael D. Hausfeld (*Pro Hac Vice* to be filed)
Swathi Bojedla  (*Pro Hac Vice* to be filed)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfeld.com
sbojedla@hausfeld.com

Mark Guerrero (Admitted *Pro Hac Vice*)
Mary Whittle (Admitted *Pro Hac Vice*)
GUERRERO & WHITTLE PLLC
114 West 7th Street, Suite 1100
Austin, TX 78701
Telephone: (512) 605-2300
Facsimile:  (512) 222-5280
mark@gwjustice.com
mary@gwjustice.com

Samuel Issacharoff (*Pro Hac Vice* to be filed)
40 Washington Square South
New York, NY 10012
Telephone: (212) 998-6580
si13@nyu.edu

Attorneys for Plaintiffs

Austin, Texas  78701
Telephone:  (512) 960-4730
Facsimile:  (512) 960-4869
mac@wittliffcutter.com
jack@wittliffcutter.com
ryan@wittliffcutter.com
katherine@wittliffcutter.com
karen@wittliffcutter.com
reid@wittliffcutter.com

<u>Certificate of Service</u>

I hereby certify that the above memorandum of law, which I filed electronically through the Court's electronic case filing system on June 25, 2018, will be sent electronically to all parties registered on the Court's electronic filing system.

*/s/ Seth V. Jackson*
Seth V. Jackson

23