**EXHIBIT A**

(Plaintiff's Br. Before Hr'g Upon the Merits, *Williams v. Virginia State Board of Elections*, C.A. No. 4768-A (E.D. Va. May 24, 1968))

IN THE

# United States District Court

For the Eastern District of Virginia

At Alexandria

———

Civil Action No. 4768-A

———

J. Harvie Williams, et al., *Plaintiffs,*

v.

Virginia State Board of Elections, etc., et al.,
*Defendants*

———

**Plaintiffs' Brief Before Hearing Upon the Merits, Upon Defendants' Motion to Dismiss, and Upon Plaintiffs' Motion for Summary Judgment**

———

FILED

MAY 27 1968

CLERK, U. S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

Howard S. Spering
  1000 Connecticut Ave.
  Washington, D. C.  20006
  Telephone: 659-1777

Paul Reiber
  1158 Swinks Mill Road
  McLean, Virginia  22101
  Telephone: EL 6-3229

    *Attorneys for Plaintiffs*

May 24, 1968

———

Press of Byron S. Adams Printing, Inc., Washington, D. C.



TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ........................... 1

QUESTIONS INVOLVED ............................. 2

STATEMENT OF THE FACTS ......................... 2

JURISDICTIONAL MATTERS RAISED BY DEFENDANTS ....... 9

   1. Proper Parties Defendant ................... 9

     A. The Governor ........................... 9

     B. The Secretary of the Commonwealth ....... 10

   2. Not an Action Against the Commonwealth of Virginia .................................. 10

   3. Class Action ............................. 11

   4. Plaintiffs' Standing To Sue ................. 12

   5. Subject Matter ............................ 13

ARGUMENT ...................................... 16

   I. PEOPLE, NOT STATES, ARE ENTITLED TO REPRESENTATIVE ELECTORS UNDER THE CONSTITUTION, JUST AS THEY ARE ENTITLED TO REPRESENTATIVES IN CONGRESS ................................... 16

     A. The Operative Effect of Article II, Section 1, of the Constitution ...................... 16

     B. Dual Citizenship and Dual Representation .. 18

   II. ELECTIONS OF REPRESENTATIVES AND OF REPRESENTATIVE ELECTORS SHOULD BE BY SINGLE-MEMBER DISTRICTS ................................. 19

     A. Because Single-Member Districts Are Required Under National Apportionment Acts 19

     B. Because Single-Member Districts Are Most Representative of All the People .......... 22

   III. THE STATE-WIDE GENERAL TICKET SYSTEM OF ELECTING ELECTORS PRODUCES INVIDIOUS MISREPRESENTATION ................................ 26

Page

IV. One-Man, One-Vote Principle Applies in All
Elections ..................................... 29

V. Representative Electors Elected by Single-
Member Districts Would Meet All Require-
ments of the Constitution ................ 31

A. The Divisibility Principle of the Twelfth
Amendment Would Be Met ............... 32

B. District-Elected Electors Would More Closely
Reflect the Expressed Will of the People ... 33

C. Equal Representation of All the People Is
Provided Through District Elections of Rep-
resentative Electors ..................... 34

D. Many of the Founders and Early Statesmen
Intended District Elections of Representative
Electors ................................. 37

E. An Early Statement Points Out the Evils of
the General Ticket System ................ 40

Summary ......................................... 41

Conclusion ....................................... 42

## TABLE OF CASES AND AUTHORITIES CITED

Cases:

Avery v. Midland County, Texas, 88 S.Ct. 1114 (April
1, 1968) ....................................... 29
Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691 (1962) ....11, 13,
14, 15
Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286 (1966)
25, 30
Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441 (1964)
11, 28, 29
Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498 (1965) ..24, 25
Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801 (1963)
13, 28, 29
Lucas v. General Assembly of Colorado, 377 U.S. 713,
84 S.Ct. 1459 (1964) ........................... 29
Mann v. Davis, 213 F. Supp. 577 ..................... 10
Maryland Committee v. Tawes, 377 U.S. 656, 84 S.Ct.
1429 (1964) ................................... 29

McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3 (1892)
13, 17, 39
Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362 (1964)
11, 15, 29, 30
Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449 (1964) .. 29
Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526 (1964) 3,
11, 13, 14, 15, 18, 20, 21, 29, 30
WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418
(1964) ...................................... 29

Constitution of the United States:

Article I, Section 2 .................17, 19, 20, 41
Article I, Section 3 ......................... 19
Article II, Section 1 ............16, 17, 18, 37, 41
Article III, Section 2 ...................... 15
Amendment XII ..............32, 33, 36, 41, 42
Amendment XIV, Section 1 ....2, 18, 21, 28, 31, 42
Amendment XIV, Section 2 .........17, 20, 30, 41

Constitution of Virginia, Article IV, Section 55 ..... 20

Statutes:

2 U.S.C.A. 2, Apportionment Act of August 8, 1911,
as amended February 14, 1912 ................. 20
2 U.S.C.A. 2a, Apportionment Act of June 18, 1929,
as amended ...................................20, 21
2 U.S.C.A. 3, Apportionment Act of August 8, 1911 .. 20
3 U.S.C.A. 6, as amended October 31, 1951 .......... 9
28 U.S.C.A. 1331 .................................. 15
28 U.S.C.A. 1343 .................................. 15
42 U.S.C.A. 1983 .................................. 15
42 U.S.C.A. 1988 .................................. 15
Act of December 14, 1967, P.L. 90-196, 81 Stat. 581,
amending 2 U.S.C.A. 2a ......................... 21
Apportionment Act of June 25, 1842, 5 Stat. 49, c. 47,
R.S. # 23, See Notes, 2 U.S.C.A. 3 ..........19, 22
Apportionment Act of February 25, 1882, See Notes, 2
U.S.C.A. 3 ................................... 19
Code of Virginia:
Title 24, Election Laws of the Commonwealth of
Virginia ...................................1, 42
Title 24, Chapter 3, Section 24-24 .............. 10

iv        Contents Continued

Miscellaneous:        Page

41 Annals of Congress 169-170 (1824) ............40, 41
Federal Rules of Civil Procedure, Rule 23 ........ 11
Hearings before a Subcommittee of the Committee on
the Judiciary, United States Senate, 84th Con-
gress, First Session, March 16, 18, 25, April 1 and
6, 1955, entitled "Nomination and Election of
President and Vice President," page 387 ........ 40
House of Representatives Report No. 909, 27th Con-
gress, 2nd Session, entitled "Apportionment Bill"
and dated July 16, 1842 ...................... 22
Letter dated January 12, 1800 from Thomas Jefferson
to James Monroe, from Vol. VII The Writings of
Thomas Jefferson, by P.L. Ford, page 401 ...... 39
Letter dated August 23, 1823 from James Madison to
George Hay, from Vol. IX The Writings of James
Madison, by Gaillard Hunt, page 147, at pages 151
and 152 ....................................38, 39
Letter dated March 29, 1828 from Chief Justice John
Marshall to the Richmond Whig and Advertiser,
published in the Enquirer dated April 4, 1828,
quoted in part in Vol. IV The Life of John Mar-
shall, by Albert J. Beveridge, page 463 .......... 40
Madison's Notes on the Constitutional Convention of
1787, Documents on the Formation of the Union,
Government Printing Office 1927 ..............34, 37
Paullin's, The Atlas of the Historical Geography of the
United States .................................. 38
Reform of the Electoral System, by Lucius Wilmer-
ding, Jr., in the March 1949 Issue of the Political
Science Quarterly, and republished in the above
cited Senate Judiciary Committee Hearing (1955)
page 383, at page 385 ......................... 41

# IN THE
# United States District Court
### For the Eastern District of Virginia
### At Alexandria

Civil Action No. 4768-A

J. Harvie Williams, et al., *Plaintiffs,*

v.

Virginia State Board of Elections, etc., et al.,
*Defendants*

**Plaintiffs' Brief Before Hearing Upon the Merits, Upon Defendants' Motion to Dismiss, and Upon Plaintiffs' Motion for Summary Judgment**

### STATEMENT OF THE CASE

The 10 plaintiffs herein seek a declaratory judgment and injunctive relief to enjoin, on constitutional grounds, the operation and enforcement of those provisions of the election laws of the Commonwealth of Virginia which impose upon its citizens the state-wide general ticket system of electing those 10 of its 12 presidential electors whose offices exist solely by virtue of the 10 Representatives in Congress ("representative" electors) apportioned to the people of

Virginia, and which deny its citizens the right to vote to elect one such elector in and solely by each of their respective Congressional districts.

This class action, in behalf of citizens of the United States resident in Virginia, invokes the provisions of the Privileges and Immunities Clause, of the Due Process Clause, and of the Equal Protection Clause, of the Fourteenth Amendment of the Constitution of the United States, and sections of the United States Code enacted in pursuance thereof, to protect and restore the full benefit of the plaintiffs' right to vote under these and other provisions of the Constitution.

### QUESTIONS INVOLVED

1. Does the Constitution of the United States require that the "representative" electors of the electoral college be elected in single-member districts, as Representatives in Congress are elected?

2. Does the state-wide general ticket system of electing the "representative" electors of the electoral college result in debasing, abridging or misrepresenting the weight of the votes of citizens of the United States in presidential elections unconstitutionally?

### STATEMENT OF THE FACTS

The 10 plaintiffs herein are citizens of the United States each resident in, and a duly qualified and registered voter in, a different one of the 10 Congressional districts of Virginia. They bring this action as a class action in behalf of themselves and in behalf of all other citizens of the United States similarly situated who, like themselves, plan to participate in the election of the President and Vice President of the United States by voting in the election of presidential electors.

The defendants herein are Mills E. Godwin, Jr., Governor of the Commonwealth of Virginia, Martha Bell Con-

way, Secretary of the Commonwealth of Virginia, and the Virginia State Board of Elections, a separate and permanent board created within the office of the Secretary of the Commonwealth. Each of the defendants has a relationship to the operation and enforcement of those provisions of the election laws of Virginia involved in this proceeding.

All material facts in this case are based upon state statutes, the procedures followed by public officials acting thereunder, public documents and records, uncontested and disinterested tabulations of public records and data, and published historical information, documents, records, reports, data and tabulations thereof. Plaintiffs will present and prove at the hearing on the merits of this case, by stipulation, by uncontested exhibits, by testimony, and/or by affidavit or by the Court's taking proper judicial notice of public documents and recognized public facts, the following, among other, facts:

1. There are 10 Congressional districts in Virginia as shown in Exhibit B of the Complaint, as redistricted by the state legislature in November 1965 to conform to the Congressional districting principle of *Wesberry* v. *Sanders*, 376 U.S. 1, 84 S. Ct. 526 (1964). Based on the 1960 U.S. Census figures, the population of each of these Congressional districts is as nearly equal as is practicable, as follows:

| | |
|---|---|
| First District | 401,052 |
| Second District | 419,642 |
| Third District | 408,494 |
| Fourth District | 386,184 |
| Fifth District | 386,179 |
| Sixth District | 381,611 |
| Seventh District | 377,511 |
| Eighth District | 400,812 |
| Ninth District | 386,948 |
| Tenth District | 418,516 |

The total population of Virginia under the 1960 Census is 3,966,949, and the mathematical average for each of the 10 Congressional districts would therefore be 396,695.

2. The form of ballot uniformly used throughout Virginia for voting in presidential elections is as shown in Exhibit A attached to the Complaint. It lists under the name of each political party and the nominees thereof for President and Vice President the names of that party's elector candidates, two designated as at-large and one listed and designated as from and resident in each of the respective 10 Congressional districts of Virginia. It permits a voter to vote only for one or another political party, and thus for the party's nominees for President and Vice President. A vote cast on such ballot constitutes, under Virginia election laws, one vote for each of the 12 electors listed thereon under the name of the party and its nominees. Using the uniform ballot, no vote can be cast and counted for any elector or electors individually, or separately from the other electors.

3. Using the uniform ballot, it is impossible to cast one vote for each of the two at-large electors and only one additional vote for the one additional elector candidate from the voter's own Congressional district. Also, it is impossible to prevent the votes cast by voters in other Congressional districts from being counted as a vote for the election of an elector candidate from one's own Congressional district.

4. The Official Statements of the Vote in Virginia for Electors of President and Vice President, as compiled from Official Records by the Secretary of the State Board of Elections, list and show only the whole number of votes cast in each county for the respective party nominee for President. It does not list or show any vote or votes as such for any individual elector or electors of any political party or from any Congressional district.

5. In the 1964 presidential election, the official state-wide popular vote in Virginia was:

| | | |
|---|---|---|
| For Lyndon B. Johnson | 558,038 | 53.5% |
| For Barry M. Goldwater | 481,334 | 46.2% |
| For Eric Hass | 2,895 | .3% |

Johnson's plurality was 76,704. All 12 of Virginia's Democratic Party electors for Johnson were thereby deemed elected under Virginia's election laws, and all 12 of Virginia's presidential electors cast their ballots for Johnson.

6. In the 1964 presidential election, the official popular vote cast in each of the 10 respective Congressional districts of Virginia was:

*1st District*

| | | |
|---|---|---|
| For Johnson | 60,386 | 56.8% |
| For Goldwater | 45,852 | 43.2% |

*2nd District*

| | | |
|---|---|---|
| For Johnson | 57,993 | 61.8% |
| For Goldwater | 35,887 | 38.2% |

*3rd District*

| | | |
|---|---|---|
| For Johnson | 58,015 | 43.2% |
| For Goldwater | 76,388 | 56.8% |

*4th District*

| | | |
|---|---|---|
| For Johnson | 43,336 | 49.0% |
| For Goldwater | 45,102 | 51.0% |

*5th District*

| | | |
|---|---|---|
| For Johnson | 37,134 | 47.6% |
| For Goldwater | 40,901 | 52.4% |

*6th District*

| | | |
|---|---|---|
| For Johnson | 53,254 | 48.3% |
| For Goldwater | 57,064 | 51.7% |

*7th District*

| | | |
|---|---|---|
| For Johnson | 40,075 | 50.9% |
| For Goldwater | 38,645 | 49.1% |

*8th District*

| | | |
|---|---|---|
| For Johnson | 47,781 | 54.0% |
| For Goldwater | 40,730 | 46.0% |

*9th District*

| | | |
|---|---|---|
| For Johnson | 55,783 | 59.8% |
| For Goldwater | 37,447 | 40.2% |

*10th District*

| | | |
|---|---|---|
| For Johnson | 104,281 | 62.2% |
| For Goldwater | 63,318 | 37.8% |

7. In the 1964 presidential election, if one elector were elected in, from, and solely by the votes cast in, each of the 10 respective Congressional districts of Virginia, and only two electors were elected at-large on a state-wide basis, the presidential electors elected would have voted as follows:

| | *For Johnson* | *For Goldwater* |
|---|---|---|
| 1st District | 1 | |
| 2nd District | 1 | |
| 3rd District | | 1 |
| 4th District | | 1 |
| 5th District | | 1 |
| 6th District | | 1 |
| 7th District | 1 | |
| 8th District | 1 | |
| 9th District | 1 | |
| 10th District | 1 | |
| | 6 | 4 |
| Two at-large | 2 | |
| Total | 8 | 4 |

Thus, 60.0% of Virginia's district or representative presidential electors would have voted for Johnson and 40% would have voted for Goldwater. The other two at-large presidential electors would have voted for Johnson, with the result that 66.66% of all of Virginia's presidential electors would have voted for Johnson and 33.33% would have voted for Goldwater.

8. In the 1960 presidential election, the official state-wide popular vote in Virginia was:

| | | |
|---|---|---|
| For Richard M. Nixon | 404,521 | 52.4% |
| For John F. Kennedy | 362,327 | 47.0% |
| For C. Benton Coiner | 4,204 | .5% |
| For Eric Hass | 397 | .1% |

Nixon's plurality was 42,194. All 12 of Virginia's Republican Party electors for Nixon were thereby deemed elected under Virginia's election laws, and all 12 of Virginia's presidential electors cast their ballots for Nixon.

9. In the 1960 presidential election, the official popular vote cast in each of the 10 respective Congressional districts of Virginia (omitting the independent party candidates) was:

*1st District*

| | | |
|---|---|---|
| For Nixon | 36,004 | 50.4% |
| For Kennedy | 35,061 | 49.1% |

*2nd District*

| | | |
|---|---|---|
| For Nixon | 29,184 | 42.4% |
| For Kennedy | 39,195 | 56.9% |

*3rd District*

| | | |
|---|---|---|
| For Nixon | 57,912 | 62.4% |
| For Kennedy | 34,448 | 37.1% |

*4th District*

| | | |
|---|---|---|
| For Nixon | 24,684 | 41.0% |
| For Kennedy | 34,820 | 57.8% |

*5th District*

| | | |
|---|---|---|
| For Nixon | 31,042 | 51.8% |
| For Kennedy | 28,366 | 47.3% |

*6th District*

| | | |
|---|---|---|
| For Nixon | 51,416 | 59.6% |
| For Kennedy | 34,663 | 40.2% |

*7th District*

| | | |
|---|---|---|
| For Nixon | 37,637 | 60.6% |
| For Kennedy | 24,252 | 39.0% |

*8th District*

| | | |
|---|---|---|
| For Nixon | 34,779 | 53.0% |
| For Kennedy | 30,296 | 46.1% |

*9th District*

| | | |
|---|---|---|
| For Nixon | 39,874 | 48.6% |
| For Kennedy | 41,776 | 51.0% |

*10th District*

| | | |
|---|---|---|
| For Nixon | 61,989 | 50.8% |
| For Kennedy | 59,450 | 48.8% |

10. In the 1960 presidential election, if one elector were elected in, from, and solely by the votes cast in, each of the 10 respective Congressional districts of Virginia, and only two electors were elected at-large on a state-wide basis, the presidential electors elected would have voted as follows:

| | For Nixon | For Kennedy |
|---|---|---|
| 1st District | 1 | |
| 2nd District | | 1 |
| 3rd District | 1 | |
| 4th District | | 1 |
| 5th District | 1 | |
| 6th District | 1 | |
| 7th District | 1 | |
| 8th District | 1 | |
| 9th District | | 1 |
| 10th District | 1 | |
| | 7 | 3 |
| Two at-large | 2 | |
| Total | 9 | 3 |

Thus 70% of Virginia's district or representative presidential electors would have voted for Nixon and 30% would have voted for Kennedy. The other two at-large presidential electors would have voted for Nixon, with the result that 75% of all of Virginia's presidential electors would have voted for Nixon and 25% would have voted for Kennedy.

11. California's number of Representatives in Congress and number of "representative" electors was 23 in 1948 and 38 in 1964. New York's number of Representatives in Congress and number of "representative" electors was 45 in 1948 and 41 in 1964. Each of these were based on the 1940 Census and the 1960 Census respectively. The number of Representatives in Congress and the number of "representative" electors of 25 of the 50 states was changed based on the changes in the 1960 Census from the 1950 Census.

## JURISDICTIONAL MATTERS RAISED BY DEFENDANTS

### 1. Proper Parties Defendant

#### A. The Governor

The Governor of Virginia is a proper party defendant in this action. It is his duty to certify to the Administrator of General Services, and to the presidential electors elected in Virginia, the names of the presidential electors so elected in Virginia and the canvass or other ascertainment under the law of the number of votes given or cast for each person. See 3 U.S.C.A. 6, as amended October 31, 1951.

He therefore has a special and definite relation to this suit. He should be enjoined by this Court against certifying the election of presidential electors in Virginia except as they shall have been elected in accordance with the ruling of this Court.

## B. The Secretary of the Commonwealth

The Secretary of the Commonwealth is a proper party defendant in this action. Under Section 24-24, Chapter 3 of Title 24 of the Code of Virginia, as amended, the Virginia State Board of Elections is a separate and permanent Board created "within" the office of the Secretary of the Commonwealth. All of the acts and records of the State Board of Elections are therefore "within" the office of the Secretary of the Commonwealth. The validity and authenticity of any act of certification of the State Board of Elections is therefore subject to certification by the Secretary of the Commonwealth. The Secretary of the Commonwealth also signs the certificate of election of electors that is forwarded by the Governor to the Administrator of General Services.

The Secretary of the Commonwealth has a special relation to this suit and is therefore a proper party defendant herein.

## 2.  Not an Action Against the Commonwealth of Virginia

This action is clearly not an action against the Commonwealth of Virginia, as contended by defendants. This action is similar in principle and theory of jurisdiction to the citizen suit involved in the important case of *Mann* v. *Davis*, 213 F. Supp. 577, that arose in this Court. This Court's statement on page 3 of its opinion in that case clearly applies in answer to the same contention of the defendants here:

> "Nor is this a suit against a State barred by the Eleventh amendment, as defendants contend. It is a suit against State officials acting pursuant to State laws, a type of action universally held appropriate to vindicate a Federally protected right. Ex parte Young, 209 U.S. 123, 155-56 (1908) ; Duckworth v. James, 267 F. 2nd 224, 230-31 (4th Cir.) cert. denied 361 U.S. 835 (1959) ; Kansas City So. Ry. v. Daniel, 180 F. 2nd 910, 914 (5th Cir., 1950)."

This Court's ruling in that case was sustained by the United States Supreme Court's decision on appeal in *Davis* v. *Mann*, 377 U.S. 678, 84 S. Ct. 1441 (1964).

### 3. Class Action

The action in *Davis* v. *Mann, supra,* was a class action of plaintiffs "residents, taxpayers and qualified voters of Arlington and Fairfax Counties filed . . . . in their own behalf and on behalf of all voters in Virginia similarly situated, challenging the apportionment of the Virginia General Assembly". At 377 U.S. 680, 84 S. Ct. 1442. That action was sustained as a class action as other similar class actions have been sustained, in the United States Supreme Court. *Baker* v. *Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962) ; *Wesberry* v. *Sanders*, 376 U.S. 1, 84 S. Ct. 526 (1964) ; *Reynolds* v. *Sims*, 377 U.S. 533, 84 S. Ct. 1362 (1964).

In the instant case the action is brought by 10 plaintiffs who are citizens of the United States and duly registered and qualified voters under the laws of Virginia. They are each resident in, and qualified voters in, a different one of the 10 Congressional districts of Virginia and bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, in behalf of themselves and in behalf of all other citizens of the United States similarly situated, as recited in paragraph 4 of the Complaint,

> "* * * who are also residents and duly qualified voters of one of said Congressional districts of Virginia and who, like themselves, plan to participate in the election of the President and Vice President of the United States by voting in the election of presidential electors and have a common interest in protecting their individual and several voting rights in such elections, their right to effective representation therein, and the rights of representation therein of minors and others resident in their respective Congressional districts who are ineligible, or otherwise unable, to vote in such elections."

This action is brought to protect and restore the full benefit of plaintiffs' right to vote. Plaintiffs seek to elect one presidential elector in, and solely by a plurality of the votes cast in, their own respective Congressional districts. They seek thereby to prevent the dilution of their own votes, and the denial of any possibility of their having any electoral representation when not part of the state-wide plurality, that now result from counting the votes of all voters throughout the state in determining the plurality of votes for the election of the one presidential elector that has been apportioned to the people resident in their respective Congressional district by virtue of their numbers. Thus, they seek to prevent the votes of residents in other Congressional districts of Virginia from being counted in determining the plurality of votes for the election of one presidential elector in, by, and from their own respective Congressional district.

As a natural and necessary corollary thereof, they seek to have their own votes not counted in determining the plurality of votes for electing one presidential elector in, by, and from Congressional districts of Virginia other than their own respective Congressional district.

Consequently, it is believed that a more truly representative and comprehensive group of plaintiffs having similar and common interests in the relief sought could not likely be conceived for bringing this action and seeking such relief.

#### 4. Plaintiffs' Standing To Sue

Plaintiffs herein have full capacity and standing to sue and to prosecute this action against the defendants. Defendants' contention to the contrary is without legal support.

Qualified voters of certain counties of Tennessee who sought a declaration that a state apportionment statute was an unconstitutional deprivation of equal protection of the

laws, were held to have standing to maintain such suit. *Baker* v. *Carr,* 369 U.S. 186, 82 S. Ct. 691 (1962). See ruling and discussion of this point at 369 U.S. 206-208, 82 S. Ct. 704-705, in which it is stated:

> "And Coleman v. Green, supra, squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue . . . . .

> "It would not be necessary to decide whether appellants' allegations of impairment of their votes by the 1901 apportionment will, ultimately, entitle them to any relief, in order to hold that they have standing to seek it."

Also, a qualified voter in Georgia seeking to restrain the use of Georgia's county unit system as a basis of counting votes, was held to have standing to sue. *Gray* v. *Sanders,* 372 U.S. 368, 83 S. Ct. 801 (1963) in which the rule was succinctly stated, at 372 U.S. 375, 83 S. Ct. 805,

> "We also agree that appellee, like any person whose right to vote is impaired (Smith v. Allwright, supra; Baker v. Carr, supra, 369 U.S. pp. 204-208, 82 S. Ct. pp. 703-705), has standing to sue."

Similarly, citizens and voters of Fulton County, Georgia, seeking to compel a redistricting of Congressional districts established under Georgia statutes, were held to have standing to sue. *Wesberry* v. *Sanders,* 376 U.S. 1, 5-7, 84 S. Ct. 526, 528-529 (1964).

#### 5. Subject Matter

The subject matter of this action is the validity under the Constitution of the United States of those provisions of Virginia's election laws providing the method and procedure of electing electors of the President and Vice President of the United States in Virginia. The subject matter is therefore comparable to the subject matter involved in *McPherson* v. *Blacker,* 146 U.S. 1, 13 S. Ct. 3 (1892), in which the United States Supreme Court ruled constitutionally

valid a Michigan election law providing for the election of electors of the President and Vice President of the United States in each of the twelve Congressional districts of Michigan as single-elector districts.

In the *McPherson* case, which arose on writ of error from a decision of the Supreme Court of Michigan the United States Supreme Court ruled, *supra,* pages 23 and 24:

> "It is argued that the subject matter of the controversy is not of judicial cognizance, because it is said that all questions connected with the election of a presidential elector are political in their nature; that the court had no power finally to dispose of them; and that its decision would be subject to review by political officers and agencies, as the state board of canvassers, the legislature in joint convention, and the governor, or, finally, the Congress.

> "But the judicial power of the United States extends to all cases in law or equity arising under the Constitution and laws of the United States, and this is a case so arising, since the validity of the state law was drawn in question as repugnant to such constitution and laws, and its validity was sustained.  *Boyd* v. *Thayer,* 143 U.S. 135. . . .

> "The question of the validity of this act, as presented to us by this record, is a judicial question, and we cannot decline the exercise of our jurisdiction upon the inadmissible suggestion that action might be taken by political agencies in disregard of the judgment of the highest tribunal of the State as revised by our own."

The contention that "exclusive authority" to protect the right of citizens to vote for Congressmen had been given to Congress, was rejected by the United States Supreme Court in *Baker* v. *Carr, supra,* and again in *Wesberry* v. *Sanders, supra,* in the following words in the latter case pages 6 and 7 (376 U.S.) and on page 529 (84 S. Ct.):

> " * * * but we made it clear in Baker that nothing in the language of that article (Article I, Section 4)

gives support to a construction that would immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction, a power recognized at least since our decision in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60, in 1803.  Cf. Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23.  The right to vote is too important in our free society to be stripped of judicial protection by such an interpretation of Article I.  This dismissal can no more be justified on the ground of 'want of equity' than on the ground of 'non-justiciability.' "  (Parenthetical material supplied).

The jurisdiction of this Court clearly exists under the provisions of Article III, Section 2 of the Constitution of the United States, and under the provisions of 28 U.S.C.A. 1331, relating to cases involving a federal question "arising under this Constitution, the Laws of the United States, and Treaties. . . ."

Jurisdiction in this Court has been clearly provided in all cases in which plaintiffs allege a deprivation of their rights as citizens under the provisions of 28 U.S.C.A. 1343, 42 U.S.C.A. 1983 and 42 U.S.C.A. 1988.  Many cases of citizen suits charging deprivation of voting rights have been recognized as within the jurisdiction of the United States Courts under those statutes, solely upon the ground of those statutory provisions.  *Baker* v. *Carr, supra,* page 187 and pages 198-204 (369 U.S.) or page 694 and pages 700-703 (82 S.Ct.); *Wesberry* v. *Sanders, supra,* page 3 and pages 6 and 7 (376 U.S.) or page 527 and page 529 (84 S.Ct.); *Reynolds* v. *Sims,* 377 U.S. 533, 537, 84 S.Ct. 1362, 1369 (1964), and other similar cases following those cases.

## ARGUMENT

### I. PEOPLE, NOT STATES, ARE ENTITLED TO REPRESENTATIVE ELECTORS UNDER THE CONSTITUTION, JUST AS THEY ARE ENTITLED TO REPRESENTATIVES IN CONGRESS

#### A. The Operative Effect of Article II, Section 1, of the Constitution

Article II, Section 1 of the Constitution of the United States creates a body of electors of the President and Vice President of the United States which in numbers and identification is at all times exactly parallel to the dual representation and membership in Congress. It provides:

"Section 1. The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four years, and together with the Vice President, chosen for the same Term, be elected as follows:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress; . . . ."

Each state as a political entity is entitled to the two electors who are the counterparts of the two United States senators to which it is entitled as a political entity.

The number of additional electors from a state is the number of Representatives in Congress to which the people of the state are entitled. The national apportionment of Representatives among the states is based upon the total population of the nation and the proportion thereof in each State, calculated from the latest national census, with 435 now being the total number of Representatives. Each Representative is elected by the people of his Congressional district. The only exception is where one or more Representatives may be elected on a state-wide or at-large basis when a proper redistricting shall not have been made prior to the election.

When the proportion of the national population residing in one state increases or decreases substantially enough, that state correspondingly gains or loses one or more Representatives. Thus, as a result largely of migration of people into California, California's number of Representatives in Congress has grown from 23 in 1948 to 38 in 1964. On the other hand, New York's number of Representatives in Congress has diminished from 45 in 1948 to 41 in 1964. The number of Representatives in Congress from 25 of the 50 states was changed based on the changes in the 1960 Census from the 1950 Census.

A presidential elector also follows the number of people requisite to entitle them to a Representative in Congress. The number of the "representative" electors of those states have changed in identically the same way.

The apportionment provisions of Section 2 of Article I of the Constitution and of Section 2 of the Fourteenth Amendment of the Constitution and the apportionment statutes enacted in pursuance thereof by Congress, automatically operate functionally as well also as provisions for apportionment of "representative" electors among the states according to the number of persons in each State. It would seem that the framers of the Constitution probably could not have made representative presidential electors any more closely bound to, and inseparable from, the apportionment provisions, acts and procedures applying with respect to Representatives in Congress.

Even the smallest state's one minimum representative elector is attributable to its people. The State cannot keep, acquire, or in any way control, the number of representative electors to be elected within its geographic limits. Chief Justice Fuller recognized this operational effect under Article II, Section 1 of the Constitution in the *McPherson* case, *supra*, when he noted, near the end of page 35 thereof, as one of the exceptions from the power and jurisdiction of the State thereunder, "the exception of the provisions as to the number of electors. . ."

It is therefore submitted that the actual operative effect of all the words in context in Article II, Section 1 of the Constitution is that the substantive right to elect one elector, who is the counterpart of a Representative in Congress, lies in the people who constitute each Congressional district.

### B. Dual Citizenship and Dual Representation

The dual character of persons as ''citizens of the United States'' and as ''citizens of the State'' is clearly established in the Constitution of the United States by use of the respective terms in the first Articles thereof and by the following positive declaration in the first sentence of Section 1 of the Fourteenth Amendment:

> ''All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.''

Dual representation was established in the Constitution in the bi-cameral Congress, providing: (1) for equal representation of states as political entities, regardless of population or any other measure of size, in the Senate by two Senators now elected under the Seventeenth Amendment in state-wide elections by the people in their capacity as citizens of the State; and (2) for representation of the people in their capacity as citizens of the United States by representatives in the House of Representatives elected directly by the people in single-member districts and apportioned among the several states according to the respective numbers of persons. In the discussion of this subject in *Wesberry* v. *Sanders*, 376 U.S. 1, 12-14, 83 S.Ct. 526, 532-533 (1964), the Court quotes William Samuel Johnson of Connecticut as follows:

> ''in one branch the *people,* ought to be represented; in the *other,* the *States.*''

The difference in the character of the representation in the two houses of Congress is sharply drawn in the provisions of Article I of the Constitution relating to qualifications, specifying: that the Representative shall be:

> ''an Inhabitant of the State *in* which he shall be chosen.'' (italics supplied).

and that the Senator shall be:

> ''an Inhabitant of the State *for* which he shall be chosen.'' (italics supplied).

This balanced and symmetrical structure of dual citizenship and dual representation in Congress applies consistently in the parallel structure of dual representation inherently established in the electoral college. Thus, the election of two electors on a state-wide basis is an election *for* the State by persons acting in their capacity as ''citizens of the State''; and the election of additional electors by each Congressional district would provide separate elections *in* each state by persons acting in their capacity as ''citizens of the United States''.

## II. ELECTIONS OF REPRESENTATIVES AND OF REPRESENTATIVE ELECTORS SHOULD BE BY SINGLE-MEMBER DISTRICTS

### A. Because Single-Member Districts Are Required Under National Apportionment Laws

In enacting apportionment acts, Congress has considered that prescribing the guiding principles for the formation of the elective units (districts) of the people to be established in the states is necessarily a part of the function of apportionment being effectuated by Congress. The Apportionment Act of June 25, 1842, 5 Stat. 491, c. 47, R.S. #23, provided that the election should be by districts. This provision was repeated in the superseding Apportionment Act of February 25, 1882, and repeated in substance in each of the subsequent apportionment acts. See Notes to 2 U.S.

C.A. 3, of the Apportionment Act of August 8, 1911, which provided:

> "3. Election by districts. In each State entitled under this apportionment to more than one Representative, the Representatives to Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants. The said districts shall be equal to the number of Representatives to which such State may be entitled in Congress, no district electing more than one Representative."

That Act of 1911, as amended February 14, 1912, 2 U.S. C.A. 2, established that the House of Representatives shall be composed of 435 Members, and apportioned them among the several states, including Arizona, and New Mexico, which became states in 1912. Notwithstanding the subsequent addition of Hawaii and Alaska as states, the total number of Representatives in the House of Representatives is now 435, and reapportionments have been effectuated under the Apportionment Act of June 18, 1929, as amended, 2 U.S.C.A. 2a. The provisions of the Act of 1911, 2 U.S. C.A. 3, above quoted, were not re-enacted in the Act of 1929 as amended, 2 U.S.C.A. 2a, and they expired by express limitations in the Act of 1911 itself upon the enactment of the Reapportionment Act of 1929. See Notes to 2 U.S. C.A. 3.

It should be noted that Article IV, Section 55 of Virginia's Constitution also requires its Congressional districts to be contiguous and compact and to have as nearly as practicable an equal number of inhabitants; and Section 24-4 of Title 24 of the Code of Virginia provides that each of such districts shall choose one representative.

The United States Supreme Court, of course, has since declared in *Wesberry* v. *Sanders, supra,* that Article I, Section 2 of the Constitution, together with the apportionment provisions therein and in Section 2 of the Fourteenth Amendment, "commands" that "as nearly as is practicable one man's vote in a congressional election is to be worth as

much as another's." Based on this command, the rule of the case is that the Congressional districts in each of the States shall be essentially equal, or as nearly equal as is practicable. Footnote 10 of the opinion shows that the Court did not need to reach the further arguments based on the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment.

Mr. Justice Black, writing for the Court, concluded at 376 U.S. 18 and 84 S.Ct. 535 with a quotation from James Madison in No. 57 of the Federalist and then stated:

> "Readers surely could have fairly taken this to mean, 'one person, one vote.' Gray v. Sanders, 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed. 2d 821.

> "While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us."

The decision in the *Wesberry* case, *supra,* may not have had the clear effect of re-establishing the requirement contained in earlier Apportionment Acts (from 1842 until 1929) providing "no district electing more than one Representative," the single-member district provision.

In any event, Congress recently has clearly reinstated this requirement of election of Representatives in single-member districts, by further amending the Apportionment Act of 1929 as follows in the Act of December 14, 1967, P.L. 90-196, 81 Stat. 581:

> "In each state entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of subsection (a) of section 22 of the Act of June 18, 1929, entitled 'An Act to provide for apportionment of Representatives' (46 Stat. 26), as amended, there shall be established by law a number of districts equal to the number of Representatives to

which such State is so entitled, and Representatives
shall be elected only from districts so established, no
district to elect more than one Representative (except
that a State which is entitled to more than one Repre-
sentative and which has in all previous elections elected
its Representatives at Large may elect its Representa-
tives at Large to the Ninety-first Congress)."

## B. Because Single-Member Districts Are Most Representative of All the People

The significant effects of the single-member district mode
of electing Representatives versus the multi-member or
general ticket system of electing Representatives upon the
nature of the resulting representation and upon the char-
acter of the government, were reviewed in connection with
the enactment of the Apportionment Act of 1842. When
President John Tyler approved and signed that Apportion-
ment Act, he lodged with it in writing a question whether
the mandatory requirement of the law that the states form
single-member districts for election of Representatives was
constitutional. A Select Committee of the House of Repre-
sentatives was promptly designated to review this action
by the President, under the chairmanship of John Quincy
Adams, who had been a Senator and President.

The Report of the Select Committee designated as Report
No. 909, House of Representatives, 27th Congress, 2d Ses-
sion, was entitled "Apportionment Bill" and dated July 16,
1842. Drawing upon his pre-eminent background in and
understanding of the history and constitutional foundations
of our government, Adams' Report states the case for
single-member districts versus multi-member districts or
the general ticket system as follows:

"The President announces that one of his reasons
for entertaining deep and strong doubts of the consti-
tutionality of the law which he has approved and signed
is, that it purports to be mandatory on the States to
form districts for the choice of Representatives in sin-
gle districts.

"The committee believe this to be by far the most
important and most useful provision of the act. They
believe, indeed, the establishment of the principle ab-
solutely indispensable to the preservation of this Union.
The representation of the people by single districts is
undoubtedly the *only* mode by which the principle of
representation, in proportion to *numbers,* can be car-
ried into execution. The provision of the Constitution
is, that the representatives shall not exceed *one* for
every thirty thousand of federal numbers, and every
act of apportionment has necessarily prescribed *one*
member for every addition of the common multiple
within each of the several States. A more unequal
mode of assembling a representation of the people in
a deliberative body could not easily be contrived than
that of one portion chosen by a general ticket through-
out the State, another portion by single districts, and
a third portion partly by single and partly by double,
treble, and quadruple districts. This forms, in the
mass, a representation not of *one* representative for the
common standard number throughout the whole Union,
but of States, and cities, and sectional divisions, in
knots and clusters of population, of different dimen-
sions and proportions, more likely to be governed by
the spirit of party than of patriotism. At present,
six of the smaller States acquire an undue share of
locally concentrated power in the House, by general
ticket elections, stifling the voice and smothering the
opinions of minorities nearly equal to half the people
of the State, thus disfranchised by the overbearing
insolence of a majority, always meager, and as it grows
leaner growing more inexorable and oppressive. The
larger States have hitherto passed over with little
notice this practical iniquity, by which the State of
New Hampshire, with five members, preponderates
over the State of New York, with forty. But it is in
the nature of things impossible that this should be
suffered to continue long. The manner of election for
the members of this House must be uniform. The gen-
eral ticket or the single district must be the common
rule for all; and if the smaller States will insist upon
sending members to this House all of one mind, New
York, or Pennsylvania, or Ohio, or all three together,

will, ere long, teach them by other results the arithmetical combination of concentrated numbers.

"Should the general ticket system universally prevail, it is obvious that the representation in this House will entirely change its character, from a representation of the people to a representation of States, and transform the constitutional Government of the United States into a mere confederation like that which, fifty-four years ago, fell to pieces for the want of ligatures to hold it together."

Mr. Justice Douglas, in his dissenting opinion in *Fortson* v. *Dorsey,* 379 U.S. 433, 440, 85 S. Ct. 498, 502 (1965), considered the case of single-member versus multi-member districts in elections of state senators in Georgia. Fulton County contained seven senatorial districts and DeKalb County contained three districts and each elected all of their senators on a county-wide voting basis, while other districts containing one or more counties each elected one senator. He agreed with the three-Judge District Court below that

" 'The statute here is nothing more than a classification of voters in senatorial districts on the basis of homesite, to the end that some are allowed to select their representatives while others are not.' . . . .

"As appellees point out, even if a candidate for one of those districts (in Fulton or DeKalb) obtained all of the votes in that district, he could still be defeated by the foreign vote (of other districts), while he would of course be elected if he were running in a district in the first group (where voting is by single-member districts). I have no idea how this weighted voting might produce prejudice race-wise, religion-wise, politics-wise. But to allow some candidates to be chosen by the electors in their districts and others to be defeated by the voters of foreign districts is in my view an 'invidious discrimination'—the test of unequal protection under the Fourteenth Amendment. Baker v. Carr, 369 U.S. 186, 244, 82 S. Ct. 691, 724, 7 L.Ed.2d 663. I had assumed we had settled this question in Gray v. Sanders, 372 U.S. 368, 379, 83 S. Ct. 801, 808, 9 L.Ed.2d 821,

where we said: 'Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment.' " (Parenthetical material supplied)

The majority of the Supreme Court in that case ruled the multi-member district situation in the *Fortson* case, *supra,* to be constitutional because the record in the case lacked any evidence that this "would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." The Court in conclusion stated, with respect to this point, the following at 379 U.S. 439 and 85 S. Ct. 501:

"Since, under these circumstances, this issue has 'not been formulated to bring it into focus, and evidence has not been offered or appraised to decide it, our holding has no bearing on that wholly separate question.' Wright v. Rockefeller, 376 U.S. 52, 58, 84 S. Ct. 603, 606, 11 L.Ed. 2d 512."

Again, in *Burns* v. *Richardson,* 384 U.S. 73, 88-89, 86 S. Ct. 1286, 1294-1295 (1966), the United States Supreme Court ruled

" 'It may be that this invidious effect can more easily be shown if, in contrast to the facts in *Fortson, districts are large in relation to the total number of legislators,* if districts are not appropriately subdistricted to assure distribution of legislators that are resident over the entire district, or if such districts characterize both houses of a bicameral legislature rather than one. But the demonstration that a particular multi-member scheme effects an indivious result must appear from evidence in the record. Cf. McGowan v. State of Maryland, 366 U.S. 420, 81 S. Ct. 1101, 6 L. Ed. 2d 393. That demonstration was not made here. 14" (Italics supplied.)

In footnote 14 thereof, the Court states:

"Appellant Burns concedes in his brief that '[i]n the case of the Hawaii House multi-member districts, extensive proofs were not put in as to the details of the submergence of minorities.' There may, for example, be merit in the argument that by encouraging block voting, *multi-member districts diminish the opportunity of a minority party to win seats*. But such effects must be demonstrated by evidence." (Italics supplied).

Plaintiffs contend that they will have shown by a preponderance of the evidence in this case that the state-wide general ticket system of electing representative electors in Virginia, in essence a multi-member district system, clearly operates to "diminish the opportunity of a minority party to win seats" in Virginia's electoral college.

### III. THE STATE-WIDE GENERAL TICKET SYSTEM OF ELECTING ELECTORS PRODUCES INVIDIOUS MISREPRESENTATION

Under the state-wide general ticket system, all of the several and divisible number of electors who are the counterparts of Representatives in Congress are elected by the same state-wide count of votes by which the two electors who are counterparts of the state's two senators are elected. Many objectionable results are shown to flow from this system, such as:

(1) All those who vote for the nominee, party, or block of electors, that receives less than the highest number of votes in the individual state, are always without any elector representing them in the electoral college,

(a) even if their votes aggregate as much as 49 per cent of all votes cast in the state, and

(b) even if their votes constitute a majority, or the highest number, or all, of the votes cast in one or more of the Congressional districts in the state.

(2) The weight of each voter's vote will inevitably either

(a) be magnified or distorted, when on the winning side, from a plurality, however narrow the margin, to 100 per cent of the total electoral votes of the state, or

(b) be completely ignored and destroyed, when on the losing side, and be invidiously misrepresented as if supporting the winning plurality.

(3) Different weight is given to the votes of residents of one state from the weight given to the votes of residents of another state. For example, a citizen in New York votes for the election of 43 electors, while a citizen in Virginia votes for the election of only 12 electors. Exhibits presented by plaintiffs in this case will show that the official certified record of the "whole number of votes given for the office of Elector of President and Vice President was 331,590,904" in New York State in the 1960 Presidential Election when the total number of persons voting in New York was 7,290,824, and was 308,032,517 in the 1964 Presidential Election when the total number of persons voting therein was 7,166,013.

(4) The facts proved in this case and reviewed above show, with respect to the 1960 and 1964 Presidential Elections, the following electoral misrepresentation of the minority party in Virginia:

|  | Virginia's Popular Vote | Percent of Popular Vote | Percent of Virginia's Electoral Vote |
|---|---|---|---|
| **1960 Presidential Election** | | | |
| For Democrat | 362,327 | 47.0 | 0 |
| For Republican | 404,521 | 52.4 | 100 |
| **1964 Presidential Election** | | | |
| For Democrat | 558,038 | 53.5 | 100 |
| For Republican | 481,334 | 46.2 | 0 |

(5) Many times as many citizens must vote for a particular nominee in large states as in single-representative states like Delaware, before their voting can have any effect or weight whatsoever in the election of the president.

(6) A substantial premium is placed on fraud in the larger states because a small margin that achieves a plurality carries 100 per cent of the large electoral vote of the state.

(7) Small splinter parties also can affect the whole electoral vote of a state by controlling the small margin that achieves a plurality in the state. For example, in 1948 Henry Wallace drew 509,000 votes largely from Truman, thereby throwing the 47 electoral votes from New York for Dewey with a plurality of only 61,000 votes out of the total of about 6,100,000 votes cast in the state.

(8) The United States Supreme Court has recognized that many inequities are present in the functioning of the electoral college:

> In *Gray* v. *Sanders, supra,* at 372 U.S. 378, 83 S. Ct. 807:
>
> "The inclusion of the electoral college in the Constitution . . . . validated the collegiate principle despite its inherent numerical inequality, . . ." Repeated in Reynolds v. Sims, 377 U.S. 574-5, 84 S. Ct. 1388.
>
> In *Davis* v. *Mann, supra,* at 377 U.S. 692, 84 S. Ct. 1448-49:
>
> "The fact that the maximum variances in the populations of various state legislative districts are less than the *extreme deviations* from a population basis in the composition of the Federal Electoral College . . ." (Italics supplied).

(9) The "one-man one-vote" principle of the Equal Protection Clause of the Fourteenth Amendment of the Constitution is breached in almost every conceivable way.

## IV. ONE-MAN, ONE-VOTE PRINCIPLE APPLIES IN ALL ELECTIONS

The United States Supreme Court has enunciated the "one-man, one-vote" of equal weight principle of the Equal Protection Clause of the Fourteenth Amendment of the Constitution in recent years in *Gray* v. *Sanders,* 372 U.S. 368, 83 S.Ct. 801 (1963) (Georgia county unit system, a state electoral college system, in party primary elections for state-wide elected offices); *Wesberry* v. *Sanders,* 376 U.S. 1, 84 S.Ct. 526 (1964) (Georgia congressional districts); and *Reynolds* v. *Sims,* 377 U.S. 533, 84 S.Ct. 1362 (1964) (Alabama state legislature apportionment); together with several other cases decided at the same time, namely, *WMCA, Inc.* v. *Lomenzo,* 377 U.S. 633, 84 S.Ct. 1418 (1964) (New York state legislature apportionment); *Maryland Committee* v. *Tawes,* 377 U.S. 656, 84 S.Ct. 1429 (1964) (Maryland state legislature apportionment); *Davis* v. *Mann,* 377 U.S. 678, 84 S.Ct. 1441 (1964) (Virginia state legislature apportionment); *Roman* v. *Sincock,* 377 U.S. 695, 84 S.Ct. 1449 (1964) (Delaware state legislature apportionment); and *Lucas* v. *General Assembly of Colorado,* 377 U.S. 713, 84 S.Ct. 1459 (1964) (Colorado state legislature apportionment). More recent cases have also applied the principle, with the latest case applying it to elections for local county governments in *Avery* v. *Midland County, Texas,* 88 S.Ct. 1114 (April 1, 1968) (single-member county districts of unequal population).

The principle is most fully expounded in the *Reynolds* case, *supra,* at 377 U.S. 554-568, 84 S.Ct. 1377-1382. It may be summarized as follows:

> The "one-man one-vote" principle of the Equal Protection clause of the Fourteenth Amendment requires that, whenever and wherever in the United States voting by any of the people is provided for in state or federal elections, the citizens of the United States are entitled to be fairly, justly, and equitably represented and effectively weighted, by district units fairly related

to their numbers, in the outcome of such election; and they are entitled to have their right to vote protected against being abridged, debased, diluted, cancelled, destroyed, discriminated against on the basis of place of residence or on any other arbitrary basis, or otherwise made ineffective or unrepresentative, by or under any laws or practices of any state, or by or under any acts of any officials thereof or of any other persons.

This Constitutional principle applies to protect "the right of all qualified citizens to vote, in state as well as in federal elections". *Reynolds* case, *supra*, at 377 U.S. 554, 84 S.Ct. 13.77. Elections "for the choice of electors for President and Vice President of the United States, Representatives in Congress" are named first, and in that order, in the provisions of the second sentence of Section 2 of the Fourteenth Amendment of the Constitution. It seems clear, therefore, that the principle applies equally with respect to elections of presidential electors.

The Court in the *Reynolds* case also indicated, at 377 U.S. 577-78 and at 84 S.Ct. 1390, that the strict requirement that Congressional districts must be based on equality of population as nearly as is practicable, as held in *Wesberry* v. *Sanders, supra*, may not have to be applied so inflexibly as to state legislative districts because of the larger number of seats in state legislative bodies to be distributed within a state than Congressional seats within the state. *Cf.* the quotation above, on page 25 of this Argument, from *Burns* v. *Richardson, supra*, concerning the possible invidious effect of multi-member districts in relatively large districts.

The gross distortions, inequities, and misrepresentations, above enumerated under heading III of this Argument as existent in the functioning of the electoral college system are not due to the provisions of the Constitution, but are entirely due to the state election laws creating the statewide general ticket system of election of those electors whose offices exist by reason of the Representatives in Congress apportioned on the basis of the number of people.

All those distortions, inequities, and misrepresentations of the weight of the votes of citizens of the United States in Virginia clearly constitute invidious discriminations against political minorities, and must be prohibited under the "one-man, one-vote" of equal weight principle of the Equal Protection Clause and related clauses of the Fourteenth Amendment.

## V. REPRESENTATIVE ELECTORS ELECTED BY SINGLE-MEMBER DISTRICTS WOULD MEET ALL REQUIREMENTS OF THE CONSTITUTION

When two electors counterpart to a state's two United States senators are elected on a state-wide basis, the people are acting in their capacity as "citizens of the state". To this extent, the electoral college system cannot be made to conform to the "one-man, one-vote" principle. The 102 electors so elected, however, constitute only approximately 19 per cent of the total 538 electoral votes. (The District of Columbia now has 3 electors, two of which we have regarded as counterpart to two United States Senators although the District does not have any Senators; and the other one of which we have regarded as counterpart to a Representative in Congress although the District does not have any Representative. This explains our reference to 436 electors elected by districts although there are only 435 Representatives and corresponding Congressional districts. It also explains our reference to 102 electors as counterpart to Senators although there are only 100 Senators from the 50 states).

The other 436 representative electors, 81 per cent of the total, if elected one in and by each congressional district, would be *constitutionally representative* of the people acting in their capacity as "citizens of the United States" in essentially equal districts. Each voter in the United States, without regard to the state of his residence, would normally vote for three electors: one "representative" elector elected in his Congressional district; and two electors elected on a state-wide basis. The inequalities of voting

in the national elections, which now exist between citizens resident in different states, and the invidious distortions and misrepresentations of the votes of citizens within the same state would be eliminated with respect to the election of 81 per cent of the nation's presidential electors.

The "one-man one-vote" principle would be fully met with respect to the election of this 81 per cent of the electors. The substantive right of the people as citizens of the United States to elect one elector in and by each Congressional district, based on their numbers, would also be fully met.

### A. The Divisibility Principle of the Twelfth Amendment Would Be Met

The provisions of the Twelfth Amendment of the Constitution clearly provide that the electors of a state may be divided as to the persons voted for as president and vice president. The Twelfth Amendment, adopted in 1804, provides that the presidential electors meeting in their respective states:

> "shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice President, and they shall make distinct lists of *all* persons voted for as President, and of *all* persons voted for as Vice President, and the number of votes for *each,* which lists they shall sign and certify, and transmit sealed to the seat of government of the United States, directed to the President of the Senate; . . . ". (Italics supplied)

The district election of "representative" electors would be fully compatible with the Twelfth Amendment, since it would provide an opportunity for a division of the electors elected in each state. In fact, a number of states had elected their presidential electors by districts prior to the adoption of the Twelfth Amendment, and this practice was followed in a number of subsequent elections by many states.

The general ticket system, on the other hand, is intended to preclude any possibility of division of the electoral votes

of the state, and therefore is contrary to the divisibility principle of the Twelfth Amendment.

### B. District-Elected Electors Would More Closely Reflect the Expressed Will of the People

It is a mathematical fact that the greater the number of units in which elective pluralities are determined and are effective to elect one elector in each unit; the smaller will be the population of each unit; the greater will be the citizens' opportunity to have an effective voice in the national election; the smaller will be the number of voters in each unit who are adversely affected thereby when on the losing side; and the more limited in ultimate effect will be any local election fraud, or any splinter party or group, or any severe weather condition or other occurrence affecting voter turnout, or local misinformation that misleads citizens. Election of one elector in each of 436 Congressional districts and the election of two electors in each of 50 states and the District of Columbia is more desirable in all of these respects than the present system involving only 50 state-wide elections of all the electors of each of the 50 states.

Moreover, the election of representative electors in and solely by Congressional districts clearly tends to cause their electoral votes to be more closely representative of the people of the state. The facts established in the evidence herein show that, on such a district basis of election, the following electoral result would have occurred in Virginia:

| | % of Popular Votes | Number of District Elector Votes | % of District Elector Votes | Total Number of Elector Votes | % of Total Elector Votes |
|---|---|---|---|---|---|
| **1960 Presidential Election:** | | | | | |
| For Democrat | 47.0 | 3 | 30.0 | 3 | 25.0 |
| For Republican | 52.4 | 7 | 70.0 | 9 | 75.0 |
| **1964 Presidential Election:** | | | | | |
| For Democrat | 53.5 | 6 | 60.0 | 8 | 66.6 |
| For Republican | 46.2 | 4 | 40.0 | 4 | 33.3 |

Similarly, the election of one elector in and solely by Congressional districts would have resulted in the following electoral result in New York:

| | % of Popular Votes | Number of District Elector Votes | % of District Elector Votes | Total Number of Elector Votes | % of Total Elector Votes |
|---|---|---|---|---|---|
| **1960 Presidential Election:** | | | | | |
| For Democrat | 52.5 | 23 | 53.5 | 25 | 55.5 |
| For Republican | 47.3 | 20 | 46.5 | 20 | 44.5 |
| **1964 Presidential Election:** | | | | | |
| For Democrat | 68.6 | 41 | 100.0 | 43 | 100.0 |
| For Republican | 31.3 | 0 | 0 | 0 | 0 |

## C. Equal Representation of All the People Is Provided Through District Elections of Representative Electors

There is another most important element inherent in the principle of representative government that the founding fathers uniformly adopted throughout the Constitution. James Wilson is reported in Madison's Notes on the Constitutional Convention for Saturday, June 9, 1787, as follows:

"He (Mr. Wilson) entered elaborately into the defence of a proportional representation, stating for his first position that as all authority was derived from the people, equal Numbers of people ought to have an equal number of representatives, and different numbers of people different numbers of representatives. . . . Representatives of different districts ought clearly to hold the same proportion to each other, as their respective Constituents hold to each other." From Documents on the Formation of the Union, Government Printing Office 1927, page 183, in discussions concerning the rule of suffrage in the first branch (House of Representatives) of Congress.

With Congressional districts of essentially equal population, a representative or a presidential elector elected in that district represents *all* of the people residing in that district. His effective weight within the particular framework of government should be, and is, measured by the essentially equal number of persons residing in each such district. He stands on a par with each other Representative or elector, as the case may be. His effective weight is not, and should not be, measured by the number of people who voted for him as against the number of people who voted for a Representative or elector from another district. Neither should his effective weight be, nor is it, measured by the total number of people who voted in his district (whether for or against him) as against the total number of people who voted in another district in the election of a Representative or elector.

The number of persons residing in any district includes the large number of children who are not of the age to be permitted to vote, resident aliens not permitted to vote, and many persons confined to institutions or homes because of illness or other physical, mental, or legal disability. Under our representative system of government, those people are all entitled to representation on a basis of equality with all other persons residing in districts of essentially equal population. Because of their large numbers across the nation, and the failure or disability for other causes (such as weather, business or whatever) of other qualified persons to vote, only about 37 per cent of the nation's total population voted in the 1964 presidential election, and only about 38 per cent voted in the 1960 presidential election.

Under the polling concept, it is generally accepted that, if only 25 per cent of the population in any district vote in an election, the plurality established by their votes will reach the same elective result that would have been reached by the plurality of the votes of 45 per cent or any other percentage of the population in the same election district if such other percentage of the population had voted. Computer predictions of election results from very early returns are based on this polling principle. This concept, of course, depends for its validity upon complete freedom of oppor-

tunity of all qualified and qualifiable persons in the district to vote and to have their votes properly counted. Under our laws great measures are taken to secure and protect that complete freedom of opportunity for all citizens to vote by secret ballot and to have their votes properly counted.

Thus, given a fair and representative district system of election, it is not so important or meaningful that a President shall have a majority or a plurality of all of the popular votes actually cast in the entire country. If the president is elected by a majority (as required under the Twelfth Amendment) of the whole number of the electors, 81 per cent of whom shall have been elected by a plurality of the votes of citizens of the United States in their respective Congressional districts, each of essentially equal population, his election will more accurately reflect, and more assuredly represent, the choice of the majority of *all* of the "people", even if, by chance, it does not also reflect the choice of the majority or plurality of those who actually voted in the election.

It is important that the President elected shall enter office with a broad base of support demonstrated in the election. The representation of states as political entities in the electoral college by the inclusion of 102 electors, elected two from each state on a state-wide basis, including the District of Columbia, adds significant support for the elected President, since the states are important and effective political entities in the national scene. Moreover, its inclusion along with district-elected "representative" electors maintains the President's constituency, to which he is responsible, the same as the basic constituency of the national government established by the Constitution.

The present state-wide general ticket system is in conflict with the basic constituency of the national government grounded in dual citizenship and dual representation.

### D. Many of the Founders and Early Statesmen Intended District Elections of Representative Electors

The first proposal of an electoral college system of election of the President that was made at the Constitutional Convention of 1787, which convened on May 25, 1787, was made by James Wilson of Pennsylvania, the highly respected lawyer-framer of the Constitution who later became an Associate Justice of the United States Supreme Court. Madison's Notes reported on June 2, 1787 the following:

"Mr. Wilson made the following motion, to be substituted for the mode proposed by Mr. Randolph's resolution, 'that the Executive Magistracy shall be elected in the following manner: That the States be divided into         districts; & that the persons qualified to vote in each district for members of the first branch of the national Legislature elect         members for their respective districts to be electors of the Executive magistracy, that the said Electors of the Executive magistracy meet at         and they or any of them so met shall proceed to elect by ballot, but not out of their own body         person in whom the Executive authority of the national Government shall be vested'.

"Mr. Wilson repeated his arguments in favor of an election without the intervention of the States. He supposed too that this mode would produce more confidence among the people in the first magistrate, than an election by the national Legislature." From Documents on the Formation of the Union, Government Printing Office 1927, page 136.

As late as August 24, 1787, Gouverneur Morris of Pennsylvania also opposed election of the President by the national Legislature, and moved that he "shall be chosen by Electors to be chosen by the People of the several states". This motion was seconded and supported by 4 "ayes" (including Pennsylvania, Virginia, Delaware and New Jersey) and 6 "noes". See Madison's continuing notes on pages 611 and 612 of said Documents.

The language finally adopted at the Convention as Section 1 of Article II of the Constitution is not inconsistent

with the intent of those motions. The drafters were confronted with the practical problems of promptly setting up and carrying out the election of the first President without time for full implementation by the states. Also it was clear that the state legislature was the instrumentality closest to the people and their control that could perform necessary acts to bring about an apportionment of electors by districts and election by the people.

From the chart appearing in Paullin's "The Atlas of the Historical Geography of the United States", page 89, which will be in evidence here, it will be noted that the election of presidential electors by the people was conducted on a district basis within a number of the states in many presidential elections prior to 1836. Election of electors by districts was employed in the following numbers of states in the respective presidential election years:

| | Number of states electing on a district basis | Total number of States participating |
|---|---|---|
| 1788-89 | 3 (incl. Virginia) | 10 |
| 1792 | 3 " " | 15 |
| 1796 | 5 " " | 16 |
| 1800 | 3 | 16 |
| 1804 | 5 | 17 |
| 1808 | 4 | 17 |
| 1812 | 4 | 18 |
| 1816 | 3 | 19 |
| 1820 | 6 | 24 |
| 1824 | 6 | 24 |
| 1828 | 4 | 24 |
| 1832 | 1 | 24 |
| 1836 | 0 | 26 |

With all this background at the Constitutional Convention, and following the Convention, it is not surprising that James Madison wrote to George Hay in a letter dated August 23, 1823 concerning the method of electing electors of the President and Vice President:

"The district mode was mostly, if not exclusively in view when the Constitution was framed and adopted; & was exchanged for the general ticket & the legislative election, as the only expedient for baffling the policy of the particular states which had set the example."

When Virginia was about to change from the district system in 1800, Thomas Jefferson, then Vice President, wrote from Philadelphia on January 12, 1800, to James Monroe:

"On the subject of an election by a general ticket, or by districts, most persons here seem to have made up their minds. All agree that an election by districts would be best, if it could be general; but while 10. states chuse either by their legislatures or by a general ticket, it is folly & and worse than folly for the other 6. not to do it. In these 10. states the minority is entirely unrepresented; & their majorities not only have the weight of their whole state in the scale, but have the benefit of so much of our minorities as can succeed at a district election. This is, in fact, ensuring to our minorities the appointment of the government. To state it in another form; it is merely a question whether we will divide the U S into 16. or 137. districts. The latter being more chequered, & representing the people in smaller sections, would be more likely to be an exact representation of their diversified sentiments. But a representation of a part by great, & a part by small sections, would give a result very different from what would be the sentiment of the whole people of the U S, were they assembled together . . ." VII Writings of Thomas Jefferson 401, P.L.Ford (1896).

Chief Justice Fuller in the *McPherson* case, *supra*, page 31, stated:

"In the fourth presidential election, Virginia, under the advice of Mr. Jefferson, adopted the general ticket, at least 'until some uniform mode of choosing a President and a Vice President of the United States shall be prescribed by an amendment to the Constitution.' Laws Va. 1799, 1800, p. 3."

When this was done in Virginia, Chief Justice John Marshall resolved never to vote during the continuance of use of the general ticket system. A letter dated March 29, 1828 from Marshall to the Richmond Whig and Advertiser, published in the Enquirer dated April 4, 1828, is quoted in part in Albert J. Beveridge's IV The Life of John Marshall 463 as follows:

> "Though I had not voted since the establishment of the general ticket system, and had believed that I never should vote during its continuance, I might probably depart from my resolution in this instance, from the strong sense I felt of the injustice of the charge of corruption against the President and Secretary of State. . . ."

The district mode of electing electors was also favored by many other leaders, such as Hamilton, Jefferson, Madison, Gallatin, James A. Bayard, John Quincy Adams, Van Buren, Benton, Webster, and Story. See page 387 of Hearings before a Subcommittee of the Committee on the Judiciary, United States Senate, 84th Congress, First Session, March 16, 18, 25, April 1, and 6, 1955, entitled "Nomination and Election of President and Vice President".

### E. An Early Statement Points Out the Evils of the General Ticket System

Senator Benton of Missouri, probably the most tireless advocate of electoral college reform in the 19th Century, in 1824 pointed out the evils of the general ticket system in the following statement in 41 Annals of Congress 169-170:

> "The general ticket system, now existing in 10 States was the offspring of policy, and not of any disposition to give fair play to the will of the people. It was adopted by the leading men of those States, to enable them to consolidate the vote of the State. * * * It contributes to give power and consequence to the leaders who manage the elections, but it is a departure from the intention of the Constitution; violates the

> rights of minorities, and is attended with many other evils. The intention of the Constitution is violated, because it was the intention of that instrument, to give to each mass of persons, entitled to one elector, the power of giving that electoral vote to any candidate they preferred. The rights of minorities are violated because a majority of one will carry the vote of the whole State * * *. In New York 36 electors are chosen; 19 is a majority, and the candidate receiving this majority is fairly entitled to count 19 votes; but he counts, in reality, 36; because the minority of 17 are added to the majority. These 17 votes belong to 17 masses of people, of 40,000 souls each, in all 680,000 people, whose votes are seized upon, taken away and presented to whom the majority pleases. * * * To lose their votes, is the fate of all minorities, and it is their duty to submit; but this is not a case of votes lost, but of votes taken away, added to those of the majority, and given to a person to whom the minority is opposed."

Lucius Wilmerding, Jr., a distinguished Princeton scholar, set forth the foregoing quotation from Senator Benton in an article entitled "Reform of the Electoral System" published in the March 1949 issue of the Political Science Quarterly. He introduced it with the statement that the evils of the general ticket "were never better set out than by Senator Benton in 1824".

### SUMMARY

Plaintiffs' contentions may be summarized as follows:

1. The structure of the electoral college, created under Article II, Section 1 of the Constitution, apportioned under the Acts of Congress to the people in pursuance of the apportionment provisions of Article I, Section 2 of the Constitution and of Section 2 of the Fourteenth Amendment, and functioning under the Twelfth Amendment and the basic representative framework of the Constitution, establishes that the "representative" electors belong to the people, not the States, and should be elected in single-member Con-

42

gressional districts by the people voting as citizens of the United States, as Representatives in Congress are elected.

2. The voting rights of citizens of the United States protected under the Fourteenth Amendment of the Constitution require that in presidential elections ''representative'' electors be elected in single-member Congressional districts in order to eliminate the many invidious discriminations inherent in state-wide general ticket elections.

3. The divisibility principle of the Twelfth Amendment of the Constitution requires that in presidential elections ''representative'' electors be elected by single-member Congressional districts rather than by state-wide general ticket elections.

4. It is unconstitutional for the election laws of Virginia to force the citizens of the United States resident therein to speak with a single voice, solely as citizens of the state, in presidential elections through state-wide general ticket elections of the ten ''representative'' electors apportioned to the people of Virginia according to their numbers.

### CONCLUSION

Plaintiffs therefore contend that judgment should be granted in their favor, and urge that the Court enter its order in accordance with the prayers of their Complaint.

Respectfully submitted,

HOWARD S. SPERING
1000 Connecticut Ave.
Washington, D. C.  20006
Telephone: 659-1777

PAUL REIBER
1158 Swinks Mill Road
McLean, Virginia  22101
Telephone: EL 6-3229

*Attorneys for Plaintiffs*

May 24, 1968