UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD J. LYMAN, WILLIAM F. WELD, and
ROBERT D. CAPODILUPO,

          Plaintiffs,

               v.

CHARLES D. BAKER, in his official capacity as
Governor of the Commonwealth of Massachusetts;
and WILLIAM FRANCIS GALVIN, in his official
capacity as Secretary of the Commonwealth of
Massachusetts,

          Defendants.

CIVIL ACTION
NO. 18-10327-PBS

**LEAVE TO FILE GRANTED ON
JULY 20, 2018**

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS COMPLAINT**

MAURA HEALEY
ATTORNEY GENERAL

Robert E. Toone, BBO #663249
Juliana deHaan Rice, BBO #564918
Amy Spector, BBO #557611
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts  02108
617-963-2178
Robert.Toone@state.ma.us

Dated:  July 23, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 1

    I.    BECAUSE PLAINTIFFS DO NOT ADEQUATELY PLEAD
        EITHER A CONCRETE AND PARTICULARIZED INJURY OR
        REDRESSABILITY, THEIR SUIT SHOULD BE DISMISSED FOR
        LACK OF JURISDICTION. ....................................................................................... 1

    II.    SETTLED CASE LAW RESOLVES THE EQUAL PROTECTION
        CLAIM. ................................................................................................................... 5

        A.    Plaintiffs' Attempt to Distinguish Settled Case Law Is Flawed. ........................ 6

        B.    "Doctrinal Shifts" Have Not Undermined *Williams*, and the
            Supreme Court's Summary Affirmance in *Williams* Remains
            Binding Precedent. ............................................................................................ 11

    III.    THE ALLOCATION OF MASSACHUSETTS'S ELECTORS ON A
         WINNER-TAKE-ALL BASIS DOES NOT VIOLATE PLAINTIFFS'
         RIGHT TO FREEDOM OF ASSOCIATION. ........................................................ 14

CONCLUSION ...................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
   564 U.S. 721 (2011)..................................................................................14n

*Baker v. Carr*, 369 U.S. 186 (1962)...............................................................2, 3

*Becker v. FEC*, 230 F.3d 381 (1st Cir. 2000) .......................................................3

*Black v. McGuffage*, 209 F. Supp.2d 889 (N.D. Ill. 2002) ........................................12n

*Burns v. Richardson*, 384 U.S. 73 (1966) ...................................................13

*Bush v. Gore*, 531 U.S. 98 (2000) (*per curiam*) ................................... 11-12

*California Democratic Party v. Jones*, 530 U.S. 567 (2000) ......................................11n

*City of Mobile v. Bolden*, 446 U.S. 55 (1980)..................................................5, 13, 15

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .......................................4

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)..................................................................................1

*FEC v. Akins*, 524 U.S. 11 (1998) ...............................................................3

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)...................................................3, 4

*Gordon v. Lance*, 403 U.S. 1 (1971).............................................................10

*Graham v. Fong Eu*, 403 F. Supp. 37 (N.D. Cal. 1975),
   *aff'd per curiam*, 423 U.S. 1067 (1976)...............................................10n

*Gray v. Sanders*, 372 U.S. 368 (1963)......................................................... 9-11

*Harris v. Arizona Indep. Redistricting Commission*,
   136 S. Ct. 1301 (2016)...............................................................12

*Hunter v. Hamilton Cty. Bd. of Elections*,
   850 F. Supp.2d 795 (S.D. Ohio 2012) .......................................................12n

*Hunter v. Hamilton Cty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011) ....................................................................12n

*Kusper v. Pontikes*, 414 U.S. 51 (1973)...............................................................14

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992)........................................... 4-5

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1991) ....................................2n

*McCutcheon v. Federal Election Commission*,
    572 U.S. 185 (2014).............................................................................11n

*McPherson v. Blacker*, 146 U.S. 28 (1892) ......................................................5

*Repub. Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir.), *reh'g denied*,
    991 F.2d 1202, *cert. denied*, 510 U.S. 828 (1993)..........................14

*Reynolds v. Sims*, 377 U.S. 533 (1964)................................................2, 3, 5, 15

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ..............................................10

*Tashjian v. Republican Party of Connecticut*,
    479 U.S. 208 (1986).........................................................................14

*United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992) ...........................2n

*United States v. SCRAP*, 412 U.S. 669 (1973).............................................2n

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ......................................................4

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...........................................................................4

*Whitcomb v. Chavis*, 403 U.S. 124 (1971)....................................................13

*White v. Regester*, 412 U.S. 755 (1973)................................................... 12-13

*Williams v. Virginia State Bd. of Elections*, 288 F. Supp. 622 (E.D. Va. 1968),
    *aff'd per curiam*, 393 U.S. 320, *reh'g denied*, 393 U.S. 1112 (1969) ..................... 1, 5-12

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 2 ...........................................................................................7

U.S. Const. amend. XII ....................................................................................................7

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(1) ............................................................................................5, 15

Fed. R. Civ. P. 12(b)(6) ...............................................................................................15

**Miscellaneous**

Congressional Quarterly, *Presidential Elections*:  1789-2008
        (Congressional Quarterly Press). ...................................................................11

## INTRODUCTION

Defendants respectfully submit this reply in further support of their motion to dismiss plaintiffs' complaint challenging the constitutionality of Massachusetts's winner-take-all system for allocation of presidential electors.  Because plaintiffs do not allege any disadvantage relative to other voters in Massachusetts, they do not have standing under Article III to bring their claims. On the merits, plaintiffs' equal protection claim requires dismissal under settled law, including the Supreme Court's summary affirmance in *Williams v. Virginia State Bd. of Elections*, 288 F. Supp. 622 (E.D. Va. 1968) (three-judge court), *aff'd per curiam*, 393 U.S. 320, *reh'g denied*, 393 U.S. 1112 (1969), as well as the other cases cited in *Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint* (Dkt. # 22) ("Def. Mem.").  Plaintiffs attempt to distinguish *Williams* by characterizing the Massachusetts electoral system as a "two-step" election for President that "discards" votes at the first step of the process, but Massachusetts's system is identical to the "unit" system upheld in *Williams* in all respects material to the equal protection analysis.  No "doctrinal shifts" have since weakened that precedent or made plaintiffs' claim any more viable.  Plaintiffs' First Amendment claim also fails, because they cannot overcome the well-established principle that the right to freely associate does not guarantee the right to succeed at the ballot box.  The complaint should be dismissed.

## ARGUMENT

### I.   BECAUSE PLAINTIFFS DO NOT ADEQUATELY PLEAD EITHER A CONCRETE AND PARTICULARIZED INJURY OR REDRESSABILITY, THEIR SUIT SHOULD BE DISMISSED FOR LACK OF JURISDICTION.

To proceed with their suit, plaintiffs must first allege an injury that is "concrete and particularized" as to them – not just a generalized grievance that they suffer "in common with people generally."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (citations omitted).  Plaintiffs do not contend that such injury arises from their concerns about the

distortion of presidential campaigns or facilitation of election interference.  *See* Compl. ¶¶ 9, 50-52.[1]  Instead, they point to the alleged "dilution" or "discarding" of their votes, and they compare their suit to the malapportionment cases, where the Supreme Court recognized the standing of "voters who allege facts showing disadvantage to themselves as individuals."  *Plaintiffs'* *Memorandum of Law in Opposition to Defendants' Motion to Dismiss* at 4-5 (Dkt. # 29) ("Opp.") (citing *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964)).  Those cases are inapposite, however, because they involved a disadvantage *relative to other voters in the State*.  *Baker*, for example, involved a classification that disfavored "the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a -vis voters in irrationally favored counties."  369 U.S. at 207-08.  Similarly, in *Reynolds*, the alleged Equal Protection violation involved, as plaintiffs themselves put it, "'[d]iluting the weight of votes' by elevating one group's votes over another."  *See* Opp. at 4 (quoting 377 U.S. at 566).

Here, by contrast, plaintiffs do not allege a disadvantage relative to other voters in Massachusetts.  The laws they challenge – constituting Massachusetts's winner-take-all system for allocating presidential electors – apply equally to everyone.  Regardless of party, every voter is in the same position:  if she votes for the electors of a presidential candidate who wins a plurality, those electors will participate at the Electoral College stage; if she votes for the electors of a losing candidate, they will not.  Injuries "widely shared" with other voters do not satisfy

---

[1] Plaintiffs cite *United States v. SCRAP*, 412 U.S. 669, 690 n.14 (1973), but that decision's highly expansive view of standing "has never since been emulated" by the Supreme Court.  *See* *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  "In light of *Lujan*, the continued vitality of SCRAP as a divining rod" for determining Article III standing is "highly questionable."  *United States v. AVX Corp.*, 962 F.2d 108, 118 (1st Cir. 1992).

Article III.  *See, e.g.*, *Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000) (citing *FEC v. Akins*, 524 U.S. 11, 23 (1998)).

Nor can plaintiffs find support in the Supreme Court's recent political gerrymandering ruling.  *See* Opp. at 5 & n.2 (citing *Gill v. Whitford*, 138 S. Ct. 1916 (2018)).  In *Gill*, the Court held that the voters *lacked* standing because they failed to present proof of any "district specific" harm actually suffered as a result of partisan gerrymandering, instead presenting evidence limited to their theory that the composition of the legislature did not reflect their voting strength on a statewide basis.  138 S. Ct. at 1930.  In reaching this result, the Court compared the individualized harm that voters might suffer at the district level as a result of partisan gerrymandering to the "disadvantage" that certain voters experienced in the malapportionment cases, *id.* (discussing *Baker* and *Reynolds*), and it contrasted those types of "individual and personal injury" with the *Gill* plaintiff voters' more general concerns about "their collective representation in the legislature," which the Court characterized as insufficiently particularized and, indeed, "nonjusticiable," *id.* at 1930-31.  Because the winner-take-all method for selection of presidential electors does not inherently disfavor plaintiffs or any particular other group of voters in Massachusetts and applies alike to all across the State – unlike the disadvantaged voters in either the malapportionment or partisan gerrymandering cases – plaintiffs here do not satisfy the "concrete and particularized" injury requirement of Article III.

Plaintiffs argue that because they vote for "the Republican, Libertarian, or other non-Democratic candidate for President in Massachusetts" and always will do so, and because pluralities of Massachusetts voters have and always will support Democratic candidates, they will be "deprived of the right to have their votes counted equally and meaningfully toward the election of the President."  Opp. at 6; *see also id.* at 7 (arguing that their votes will be diluted

while "the votes of Democratic-voting citizens are amplified").  Standing, however, may not be based on "speculation about the decisions of independent actors," including plaintiffs' speculation about how they or others in Massachusetts will vote in future elections.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).  In fact, in recent decades, Massachusetts voters have repeatedly supported non-Democratic candidates at the statewide level, including in presidential elections.  In any event, the purported injury that plaintiffs suffer as non-Democratic voters is insufficient to support an equal protection claim in the absence of invidious discrimination, *see, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977), and plaintiffs cannot plausibly allege that Massachusetts – a state in which the Republican Party was the dominant party through the 1920s – adopted its winner-take-all system in the early 1800s in order to favor Democratic voters.

Citing *dicta* from a concurrence in *Gill*, plaintiffs also argue that they have suffered a distinct associational injury under the First Amendment.  *See* Opp. at 5 (citing *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring)).  To establish standing for that claim, however, plaintiffs must plausibly allege "concrete 'burdens on a disfavored party' and its members as they pursue their political interests and goals."  138 S. Ct. at 1940 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (concurring opinion of Kennedy, J.)); *see also id.* at 1939 (discussing "evidence of partisan asymmetry").  Again, Massachusetts's winner-take-all system does not impose asymmetric burdens on any particular party, and it has no effect on the ability of a party to determine its structure, engage in political activities, or select its leaders.  Rather, it sets a neutral rule of general applicability that allocates the state's presidential electors to whoever wins the plurality vote.

Even if plaintiffs were able to show a concrete and particularized injury, dismissal would

still be required because they cannot show that their alleged injury "will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiffs point to the power of the courts to remedy malapportionment, *see* Opp. at 6 (quoting *Reynolds*, 377 U.S. at 566), but that does not divest the States of their constitutionally vested authority over "the appointment and mode of appointment of electors," *McPherson v. Blacker*, 146 U.S. 28, 35 (1892); *see also Williams v. Virginia State Bd. of Elections*, 288 F. Supp. 622, 628 (E.D. Va. 1968) (three-judge court) (holding that state legislature has "the choice" to either "weaken" or "maximize" the impact of its electoral votes in the electoral college tally), *aff'd per curiam*, 393 U.S. 320, *reh'g denied*, 393 U.S. 1112 (1969).  And plaintiffs do not deny that the relief they seek here would diminish the impact of Massachusetts voters while doing nothing to eliminate the "outsized political influence" of the nation's battleground states about which they complain. *See* Compl. ¶ 8.  Dismissal is therefore proper under Rule 12(b)(1).

## II.    SETTLED CASE LAW RESOLVES THE EQUAL PROTECTION CLAIM.

While acknowledging that winner-take-all systems have been in place since the nation's founding, plaintiffs argue that such longstanding tradition is not dispositive of the equal protection issue presented; they note that adherence to tradition has been used to justify "some of the most abhorrent practices" in our nation's history.  Opp. at 7.  That is no doubt true, but plaintiffs' comparison is wholly inapposite.  All of the courts that have considered equal protection challenges to "winner-take-all" systems have rejected them not based on blind adherence to tradition, but, because even though the Equal Protection Clause guarantees "the right to participate in elections on an equal basis," it "does not protect any 'political group,' … from political defeat."  *City of Mobile v. Bolden*, 446 U.S. 55, 77 (1980) (plurality).  *See generally* Def. Mem. at 11-15.

## A.     Plaintiffs' Attempt to Distinguish Settled Case Law Is Flawed.

Because the Virginia "general ticket" system upheld in *Williams* is the same as

Massachusetts's winner-take-all system in all respects material to the equal protection analysis,

the Supreme Court's summary affirmance in *Williams* requires dismissal of plaintiffs' equal

protection claim here.  As described in a brief filed in *Williams* (attached as an exhibit to

plaintiffs' memorandum), the Virginia ballots listed, under the name of each political party, that

party's presidential and vice-presidential candidates and, below those names, the names of that

party's elector candidates.  *See* Opp., Ex. A at 4.  The ballot "permit[ted] a voter to vote only for

one or another political party, and thus for the party's nominees for President and Vice

President."  *Id.*  "A vote cast on such ballot constitute[d], under Virginia election laws, one vote

for each of the 12 electors listed thereon under the name of the party and its nominees.  Using the

uniform ballot, no vote [could] be cast and counted for any elector or electors individually, or

separately from the other electors."  *Id.*  Virginia's "general ticket" system thus shared the

essential feature of Massachusetts's winner-take-all system:  the election of a single slate of

electors, all of whom were allocated as a "unit" to the related party's presidential candidates

winning the most votes.

Plaintiffs try to distinguish the electoral system upheld in *Williams*, but the distinctions

they draw have no bearing on the equal protection analysis.  Plaintiffs point to the fact that the

individual electors' names appeared on the Virginia ballot at issue in *Williams* (along with the

names of the presidential and vice-presidential candidates), whereas in Massachusetts, only the

names of the presidential and vice-presidential candidates (and not the electors' names) appear

on the ballot.  Opp. at 2; *id.*, Ex. A at 4.  In plaintiffs' view, the presence of electors' names on

the ballot in *Williams* signified that Virginia voters "cast their vote for Electors."  *See* Opp. at 11.

By contrast, plaintiffs argue, the absence of individual electors' names on the Massachusetts

ballot shows that Massachusetts only "pretends" that "voters cast ballots … for … Electors," *id.*
at 2, while the "reality" is that "people vote for the President and the states allocate Electors
solely to consolidate and count those votes*," id.* at 14.

Notwithstanding plaintiffs' pronouncements about what is pretend and what is reality, the
constitutional framework undeniably mandates the election of a President by Electors and leaves
to the States the decision how to select their Electors. *See* U.S. Const. amend. XII; *id.* art. II, § 1,
cl. 2. In Massachusetts, voters express their preferences for a presidential candidate by casting
votes for the "electors for" that candidate. There is no meaningful distinction between that
electoral system and the system upheld in *Williams*, where – irrespective of the presence of
individual electors' names on the ballot – voters could vote only for all of the electors as a
solitary "unit," the voters as a practical matter signifying their preference for "one or another
political party, and thus for the party's nominees for President and Vice President," according to
the *Williams* brief cited by plaintiffs. *See* Opp., Ex. A at 4. A sample Virginia ballot presented
to the court in *Williams* confirms that voters checked a box to signify their support for the
presidential candidate of one or the other recognized political parties.[2]

Indeed, the emphasis plaintiffs place on this issue is belied by the fact that the *Williams*
court did not even mention that electors' names were listed on the Virginia ballot – apparently

---

[2] The sample ballot, for Powhatan County, Virginia, in the 1964 presidential election (attached as
Exhibit A to the Complaint in *Williams*, and attached as Exhibit A here), had the date of the
election, followed by the phrase "For President and Vice-President," and, below that phrase,
voters could check a box for "Democratic Party" (under which box appeared the phrase "Electors
for LYNDON B. JOHNSON for President and HUBERT H. HUMPHREY for Vice-President,"
followed by a list of the names of the Democratic Party electors); "Republican Party" (under
which box appeared the phrase "Electors for BARRY M. GOLDWATER for President, and
WILLIAM E. MILLER for Vice-President," followed by the names of the Republican Party
electors); or for a third party which was similarly identified by presidential and vice-presidential
candidates followed by elector names.

because it was of no consequence to the court's constitutional analysis. That is not surprising, because in *Williams* (as here), the gravamen of plaintiffs' equal protection claim was that all of the electors were awarded to the presidential candidate who garnered a plurality of the statewide vote, which the *Williams* plaintiffs alleged resulted in "debasing" or "abridging . . . the weight of" votes for the losing candidate. 288 F. Supp. at 626. In *Williams* (as here), it was the allocation of electors on a "unit" (*i.e.*, "winner-take-all") basis that occasioned the alleged harm. The presence of the electors' names on the ballot made no difference to the court's analysis (and, ultimately, rejection) of the equal protection claim.[3]

In holding that Virginia's "winner-take-all" system did not violate equal protection, the three-judge district court instead focused, properly, on the nature of the claimed equal protection violation: the contention that the election of *all* of Virginia's electors, "collectively chosen in the Presidential election by the greatest number of votes cast" statewide, violated the "one person, one vote" principle because it allegedly "disfranchised" voters whose preferred candidates lost the election. 266 F. Supp. at 623. As the court in *Williams* summarized objections to the "unit" rule:

> the effect of the unit rule is to exhaust the power of millions of individual votes at the State level before the election is actually determined at the national level. They lose their effect on the outcome at a preliminary stage in the counting. These voters are disfranchised in the sense that their votes

---

[3] Plaintiffs thus miss the mark in arguing that the *Williams* court "does not address Plaintiffs' primary constitutional claim: that a state may not discard votes *for the President*" through a winner-take-all system. Opp. at 10-11 (emphasis in original). The court recognized that voters' ballot choices signified their preferences for the *presidential* candidate of a particular party, as reflected in the court's description of past election results, which referenced the respective parties' *presidential* nominees: "[W]hile in 1960 the popular vote in Virginia *for the Republican nominee* was only 52.4%, and the Democratic nominee received 47% of the vote cast, *the Republican* was credited with 100% of Virginia's electoral votes and the Democrat with none. With the popular count reversed, the candidates in 1964 were favored and unfavored in electoral votes by the same formula." 288 F. Supp. at 625-26 (emphasis added).

have no bearing on the national electoral vote totals which determine the
winner.

*Id.* at 627.  Plaintiffs here articulate the *identical* equal protection theory, characterizing

Massachusetts's election as a "two-step process for counting votes," Opp. at 15, in which votes

for a losing candidate allegedly are "discarded" at the state level and have "no effect" on the

outcome at the "second step," *i.e.*, the national level.  Compl. ¶ 13; Opp. at 15 (arguing that

"only the votes for the winning candidate matter in the second step when the final vote count

occurs").  Given the identical nature of the equal protection claims made in *Williams* and by

plaintiffs here – and because the differences in the Virginia ballot highlighted by plaintiffs here

were immaterial to the *Williams* court's holding – that holding is controlling here.

Further brushing aside the constitutional requirement that States select electors, plaintiffs

contend that in characterizing the Massachusetts ballot as entailing a vote for electors, defendants

are relying on a "transparent fiction" in order "to avoid the applicability of *Gray v. Sanders*, 372

U.S. 368 (1963)."  Opp. at 2.  Beyond ignoring the Constitution's mandate that States choose

electors who then elect the President, plaintiffs' argument reflects a fundamental

misunderstanding of the import of *Gray*, where the Court struck down Georgia's "county unit"

system for primary elections because it resulted in geographic discrimination.  372 U.S. at 379.

Plaintiffs seize on language in a footnote in *Gray*, where the Court stated that, even if

Georgia's county unit votes had been allocated based on population, some "weighting" of votes

would still occur, because "if a candidate won 6,000 of 10,000 votes in a particular county, he

would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing

and being counted only for the purpose of being discarded."  372 U.S. at 381 n.12.  Plaintiffs

contend that, like the county unit system in *Gray*, "Massachusetts relies on a two-step process for

counting votes" and that Massachusetts's winner-take-all system is invalid because, as in *Gray*,

"votes for a candidate who failed to win a plurality in the first step are thus counted 'only for the purpose of being discarded' before the final tally."  Opp. at 15 (quoting *Gray*, 372 U.S. at 381 n. 12).

Plaintiffs' reliance on the footnote 12 in *Gray* is misplaced.  The Supreme Court's clarification of that footnote in *Gordon v. Lance*, 403 U.S. 1, 4 (1971), leaves no doubt that the equal protection violation in *Gray* was *not* the "discarding" of votes by voters who chose a losing candidate in a "two-step" system, but rather the *different treatment* of voters based on where they lived:  "The defect … continued to be geographic discrimination.  Votes for the losing candidates were discarded solely because of the county where the votes were cast."  *Gordon*, 403 U.S. at 4. *See also Short v. Brown*, 893 F.3d 671, 678 (9th Cir. 2018) (describing both *Gray* and *Reynolds v. Sims* as standing for principle that "a state may not *allocate representation differently* based on a voter's county of residence") (emphasis in original).[4]  *Gray* thus does not support plaintiffs' claim that the electoral system in Massachusetts and 47 other States violates the Equal Protection Clause.[5]

*Gray* also does not support plaintiffs' claim of "discrimination on the basis of party affiliation," which plaintiffs acknowledge "was not at issue in *Gray*" but which they nevertheless suggest finds support in that ruling.  Opp. at 16.  As discussed above, *Gordon v. Lance* made

---

[4] Plaintiffs unsuccessfully attempt to distinguish *Graham v. Fong Eu*, 403 F. Supp. 37 (N.D. Cal. 1975), *aff'd per curiam*, 423 U.S. 1067 (1976), on the basis that that case involved a primary rather than a general election.  *See* Opp. at 11 n.10.  That fact was not germane to the purpose for which defendants cited *Graham*, namely, to underscore that the "defect considered in *Gray* was solely that of 'geographic discrimination.'"  403 F. Supp. at 43 n.25; *see* Def. Mem. at 16-17.

[5] Plaintiffs also attempt to characterize their claim as one of geographic discrimination, stating that "Massachusetts' [winner-take-all system] operates to minimize the votes of non-Democratic voters *in Massachusetts* in exactly the way the *Gray* court condemned."  *See* Opp. at 15 (emphasis in original).  This contention does not plausibly allege *geographic* discrimination in Massachusetts, because plaintiffs have not suggested that they are treated differently from other voters *within* Massachusetts depending on where they live within the Commonwealth.

clear that the Court's concern in *Gray* was geographic discrimination. And it is clear that

Massachusetts's winner-take-all system does *not* discriminate based on party affiliation: the

Commonwealth's statute allocating all of Massachusetts's electors to the winner of the plurality

of the vote is a neutral provision that applies equally regardless of the party affiliation of the

candidates receiving the plurality of the vote. The fact that, since the founding of the nation,

Republican presidential candidates have actually won the popular vote in Massachusetts – and

thus were awarded all of its electors – more often than the candidates of any other party

(including the Democrats) reflects that the winner-take-all system does not inherently favor any

particular party in Massachusetts.[6] *See* Congressional Quarterly, *Presidential Elections*: 1789-

2008 (Congressional Quarterly Press).

**B.     "Doctrinal Shifts" Have Not Undermined *Williams*, and the Supreme Court's Summary Affirmance in *Williams* Remains Binding Precedent.**

Plaintiffs are also wrong to assert that "important doctrinal shifts" have weakened the

force of *Williams*. Opp. at 12-13. They rely chiefly on *Bush v. Gore*, 531 U.S. 98 (2000) (*per

curiam*), to argue that the Supreme Court has "dispensed with invidiousness … as a necessary

element of a one person, one vote claim," Opp. at 12, but their argument defies common sense.

*Bush v. Gore* concerned a constitutional violation arising from the absence of uniform standards

governing the Florida recount of votes – circumstances completely unrelated to the equal

protection claim that plaintiffs make here. There is nothing in the decision that remotely

suggests a "doctrinal shift" eliminating any inquiry into invidiousness regardless of the nature of

---

[6] Two examples of "modern voting rights jurisprudence" cited by plaintiffs in addition to *Gray*, *see* Opp. at 8, also are irrelevant to the propriety of Massachusetts' allocation of presidential electors. Those cases involved a limit on campaign contributions, *McCutcheon v. Federal Election Commission*, 572 U.S. 185 (2014), and a "blanket primary" provision requiring political parties to allow non-members to vote in party primaries notwithstanding party rules to the contrary, *California Democratic Party v. Jones*, 530 U.S. 567 (2000).

the equal protection claim presented.  Indeed, by its own terms, the decision is limited to the

unusual facts presented.  *See* 531 U.S. at 109.  And plaintiffs conspicuously fail to mention

*Harris v. Arizona Indep. Redistricting Commission*, 136 S. Ct. 1301, 1307 (2016), which shows

that the Supreme Court continues to consider invidiousness in resolving equal protection claims

involving voting rights.  *See* Def. Mem. at 14.[7]

Even more mystifying is plaintiffs' suggestion that *White v. Register*, 412 U.S. 755

(1973), decided a few years after *Williams*, "fundamentally shifted the legal landscape" in a

manner helpful to plaintiffs.  *See* Opp. at 12.  In *White*, the Supreme Court reaffirmed that the

use of plurality voting to select multiple candidates within a district was constitutionally

permissible absent a showing that such a system was used "invidiously to cancel out or minimize

the voting strength of racial groups."  412 U.S. at 765.  The Court emphasized that in order to

establish a constitutional violation based on racial discrimination, a minority group had to show

more than that it had not won legislative seats "in proportion to its voting potential."  412 U.S. at

765-66.  Instead, plaintiffs had to "produce evidence to support findings that the political

processes leading to nomination and election were not equally open to participation by the group

in question – that its members had less opportunity than did other residents in the district to

participate in the political processes and to elect legislators of their choice."  *Id*. at 766.  The

Court went on to hold that under the particular facts presented – which included a history of

---

[7] Other cases cited by plaintiffs for the proposition that a showing of "intentional discrimination"
is no longer required, *see* Opp. at 12-13 & n.12, are distinguishable because they involved either
claims based on the use in different localities of different types of voting equipment "with
substantially different levels of accuracy," *see Black v. McGuffage*, 209 F. Supp. 2d 889, 898
(N.D. Ill. 2002), or claims based on lack of uniform standards or uniform application of
procedures in the counting of provisional ballots, *see Hunter v. Hamilton Cty. Bd. of Elections*,
635 F.3d 219 (6th Cir. 2011); *Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795
(S.D. Ohio 2012).

systemic, "invidious," and "official racial discrimination" against African Americans and Mexican Americans in the two Texas counties at issue – the use of multi-member districts violated equal protection because it "effectively excluded" and "removed" those minority groups from participation in the political process.  412 U.S. at 765-69.

Plaintiffs are wildly off the mark in asserting that Massachusetts's winner-take-all system is "indistinguishable" from the system that the Court struck down in *White v. Regester*.  *See* Opp. at 17-18.  Massachusetts's facially-neutral winner-take-all system – which enables any political party, at any given time, to be allotted all Massachusetts electors – bears no resemblance to the Texas system found in *White* to be "invidiously discriminatory against cognizable racial or ethnic groups," 412 U.S. at 756, and which had its roots in official efforts such as "the poll tax and the most restrictive voter registration procedures in the nation." 412 U.S. at 768.

Finally, the case law cited by plaintiffs with respect to "multi-member" districts does not support their claim.  *See* Opp. at 17-18.  Defendants cited several cases upholding multi-member districts by way of analogy, simply to underscore that the Supreme Court has rejected the notion that any political group has a constitutional right "to elect candidates in proportion to its numbers."  *City of Mobile v. Bolden*, 446 U.S. at 75; *see* Def. Mem. at 17-18.  In response, plaintiffs point to broad language in *Burns v. Richardson*, 384 U.S. 73 (1966), that multi-member districts may be invalid if they "cancel out" the "voting strength of … political elements of the voting population," but *Burns* did not hold that every political party must win seats in a multi-member body in order to satisfy equal protection.  Indeed, the Court expressly rejected that notion in *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971), *see* Def. Mem. at 17-18, and reiterated nine years later that the Equal Protection Clause "does not protect any 'political group,' however defined, from electoral defeat," *City of Mobile*, 446 U.S. at 77.

**III.    THE ALLOCATION OF MASSACHUSETTS'S ELECTORS ON A WINNER-TAKE-ALL BASIS DOES NOT VIOLATE PLAINTIFFS' RIGHT TO FREEDOM OF ASSOCIATION.**

Plaintiffs' argument that Massachusetts's winner-take-all system burdens their right to freedom of association is based on the same flawed premise underlying their equal protection claim, *i.e.*, the notion that votes for a losing slate of electors are "discarded" or "diluted" merely because they are not translated into electoral votes.  *See* Opp. at 19-20.  Plaintiffs completely ignore the cases cited by defendants for the principle that the First Amendment does not "guarantee political success."  *See Repub. Party of N.C. v. Martin*, 980 F.2d 943, 960 (4th Cir.), *reh'g denied*, 991 F.2d 1202, *cert.denied*, 510 U.S. 828 (1993); Def. Mem. at 20.

Further, none of the cases cited by plaintiffs supports their theory that the winner-take-all system violates their right to freedom of association.  *Kusper v. Pontikes*, 414 U.S. 51, 57-58 (1973), for example, involved a statute that barred voters from voting in a party primary election if they voted in any other party's primary within the preceding 23 months, a restriction that the Court found violated the right to freedom of association because it "substantially restrict[ed] an Illinois voter's freedom to change his political party affiliation," and thus "substantially abridged [plaintiff's] ability to associate effectively with the party of her choice."  Massachusetts's winner-take-all allocation of electors imposes no similar restrictions on voters.  *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 216, 225 (1986), likewise held that a closed-primary law violated the associational rights of a state Republican Party, which the law precluded from implementing its rule allowing independent voters to cast votes in Republican primary elections.  Again, no such restriction on a party's associational rights exists here.[8]

---

[8] Plaintiffs also cite *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736-37, 754-55 (2011), in support of their contention that the winner-take-all system "incentivizes candidates to focus only on battleground states that do not include Massachusetts," limiting the ability of Massachusetts voters to exercise their First Amendment rights.  *See*

Lastly, plaintiffs cite the general statement in *Reynolds v. Sims*, 377 U.S. 533 (1977), that citizens have a right to "full and effective participation in the electoral process," but tellingly ignore the Supreme Court's subsequent holding that it is "obvious" that use of a plurality voting system (*i.e.*, one that does not provide for the proportional representation sought by plaintiffs) does not "dilute" votes "in the sense in which that word was used in the *Reynolds* case." *City of Mobile v. Bolden*, 446 U.S. at 78.

## **CONCLUSION**

For the reasons stated above and in defendants' initial memorandum of law, the Court should dismiss the Complaint in its entirety, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

Respectfully submitted,

GOVERNOR CHARLES D. BAKER and
SECRETARY WILLIAM F. GALVIN,

By their attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Amy Spector
Robert E. Toone, BBO #663249
Juliana deHaan Rice, BBO #564918
Amy Spector, BBO #557611
Assistant Attorneys General
One Ashburton Place
Boston, Massachusetts  02108
(617) 963-2076
amy.spector@state.ma.us

Dated:  July 23, 2018

---

Opp. at 20 & n.19.  That case is readily distinguishable:  it involved a public campaign financing "matching funds" provision pursuant to which spending by privately-financed candidates triggered payment of public funds to publicly-financed opponents, a system that the Court found burdened the political speech of the privately-financed candidates.

Certificate of Service

I hereby certify that the above memorandum of law, which I filed electronically through the Court's electronic case filing system on July 23, 2018, will be sent electronically to all parties registered on the Court's electronic filing system.

/s/ Amy Spector
Amy Spector