### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
_____
                                  )
RICHARD J. LYMAN, WILLIAM F. WELD, )
and ROBERT D. CAPODILUPO,         )
                                  )
                Plaintiffs,       )
                                  )        Civil Action
v.                                )        No. 18-10327-PBS
                                  )
CHARLES D. BAKER, in his official )
capacity as Governor of the       )
Commonwealth of Massachusetts, and )
WILLIAM FRANCIS GALVIN, in his    )
official capacity as Secretary of )
the Commonwealth of Massachusetts, )
                                  )
                Defendants.       )
_____)
```

### MEMORANDUM AND ORDER

December 7, 2018

Saris, C.J.

### INTRODUCTION

The plaintiffs, two Republicans and one Libertarian, challenge the constitutionality of Massachusetts's system for allocating electors in presidential elections. The plaintiffs have voted and plan to continue voting in Massachusetts for presidential candidates who are not members of the Democratic Party. They allege that their votes for these candidates are effectively discarded because Massachusetts has adopted a "winner-take-all" ("WTA") system for selecting electors. In this system, the candidate receiving the most votes in Massachusetts

1

is awarded all of the Commonwealth's electors, with the other candidates receiving no electors. The plaintiffs seek a declaration that this system violates the United States Constitution -- both the "one person, one vote" principle rooted in the Equal Protection Clause of the Fourteenth Amendment (Count I) and the voters' freedom of association protected by the First and Fourteenth Amendments (Count II). In their view, the Constitution requires a "more equitable" method for distributing electors, one that allocates electors proportionately to parties.

The Complaint seeks a declaration that the WTA system is unconstitutional and a corresponding injunction. It also asks the Court to impose a deadline by which state authorities must implement a valid method of selecting electors.

The defendants have moved to dismiss based on Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. After hearing, the Court concludes that the Massachusetts winner-take-all system of selecting electors in presidential elections is constitutional. The motion to dismiss (Dkt. No. 21) is **ALLOWED**.

## FACTUAL BACKGROUND

The following facts are drawn from the Complaint.

## I.   The Parties

Plaintiff William F. Weld is a registered Libertarian and the former Republican Governor of Massachusetts. Plaintiffs

Richard J. Lyman and Robert D. Capodilupo are registered Republicans. All three plaintiffs are Massachusetts residents. They have consistently voted for non-Democratic candidates for president, and they intend to continue to do so in future presidential elections.

Defendant Charles D. Baker is the Governor of Massachusetts. Defendant William Francis Galvin is the Secretary of the Commonwealth, and his office administers elections. Both are sued in their official capacities.

## II.  **Winner-Take-All Selection of Electors**

Massachusetts, along with 47 other states and the District of Columbia, has adopted statutes under which its electors for president and vice president are appointed on a winner-take-all ("WTA") basis. See Mass. Gen. Laws ch. 54, § 118 (stating that electors "who have received the highest number of votes . . . shall . . . be deemed to be elected"). Under this system, the political party of the candidate who receives the most votes in Massachusetts appoints all of the Commonwealth's electors. See id. For example, in 2016, Secretary Hillary Clinton received 60 percent of the votes in Massachusetts and all of its electors. President Donald Trump received 32.8 percent of the Massachusetts vote, but none of its electors.

The end result of the WTA system is that the top vote-getter receives all of the Commonwealth's electors, and the

3

other candidates receive no electors. This is true regardless of whether the winning candidate earns a majority or a mere plurality of the popular vote. See Mass. Gen. Laws ch. 54, § 118 (requiring governor and secretary of state to collect names of presidential electors who receive more than one-fifth of entire number of votes cast for electors and deeming the highest vote-getter the winner). And it applies regardless of whether the candidate wins by a large margin or a slim one. See id.

The plaintiffs allege that the WTA system weakens the influence of Massachusetts voters in presidential elections. They claim that the WTA system leads candidates to focus disproportionate attention on "battleground" states that represent only 35 percent of eligible voters nationwide. In addition, they allege that the WTA system facilitates outside interference in presidential elections because a small number of voters in predictable battleground states exert undue influence over the presidential election results.

## DISCUSSION

### I. Standing

Moving to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the defendants' attack the plaintiffs' standing to bring this case. To satisfy standing, "[t]he party invoking federal jurisdiction bears the burden of establishing [three] elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). First, the

plaintiff must have suffered an "injury in fact" -- that is, an invasion of a legally protected interest which is both "concrete and particularized," and "actual or imminent," as opposed to "conjectural or hypothetical." Id. at 560. "Second, there must be a causal connection between the injury and the conduct complained of." Id. "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 43 (1976)).

In their brief, the defendants attacked two of these requirements: injury-in-fact and redressability. At oral argument, the parties agreed that the injury-in-fact analysis overlaps with the merits of the plaintiffs' constitutional claims. In other words, if WTA is unconstitutional, then the plaintiffs have suffered an injury-in-fact; otherwise, they have not. See Erwin Chemerinsky, Federal Jurisdiction § 2.3.2 (4th ed. 2003) (describing how, in some cases, "deciding whether there is an injury to a legally protected constitutional interest . . . requires inquiry into the merits of the case").

Accordingly, the Court will proceed directly to analyzing the plaintiffs' constitutional claims under the well-established standard for Fed. R. Civ. P. 12(b)(6). On a motion to dismiss under Rule 12(b)(6), the Court must analyze whether the complaint contains sufficient factual matter to state a claim to

relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

## II. "One Person, One Vote" Claim

The plaintiffs assert that Massachusetts's WTA system for allocating electors violates the "one person, one vote" principle. The defendants argue that this claim is foreclosed by binding Supreme Court precedent. They also argue that even without this precedent, the WTA system does not violate "one person, one vote" because it does not weigh votes in a disparate or arbitrary fashion. The Court agrees with the defendants on both points.

### A. Constitutional Backdrop

The United States Constitution provides for election of the president and vice president by electors. U.S. Const. art. II, § 1. It provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors." Id. The number of electors for each state is equal to the sum of its United States Senators and Representatives. See id.

The method by which the electors select the president and vice president is set forth in the Twelfth Amendment. See U.S. Const. amend. XII. The Twelfth Amendment also provides for the election of the president by the House of Representatives and the vice president by the Senate when no majority is obtained in

6

the electoral college. Id. It has long been observed that the "electoral college was designed by men who did not want the election of the President to be left to the people." Gray v. Sanders, 372 U.S. 368, 376 n.8 (1963); The Federalist No. 68 (Alexander Hamilton) (describing philosophy behind electoral college).

   **B.   The Williams Decision**

   In Williams v. Va. State Bd. of Elections, 288 F. Supp. 622 (E.D. Va. 1968), aff'd, 393 U.S. 320 (1969), a three-judge panel of the district court rejected a constitutional challenge to Virginia's WTA system for selecting electors in a statewide general election. 622 F. Supp. at 629. The plaintiffs argued that the WTA system was unfair because it accorded no representation among the electors to the minority of voters. Id. at 623. The plaintiffs in that case specifically pressed the argument, among others, that the WTA system "violates the 'one-person, one-vote' principle of the Equal Protection Clause of the Fourteenth Amendment, i.e., the weight of each citizen's vote must be substantially equal to that of every other citizen." Id. at 624. The Supreme Court had recognized the "one person, one vote" principle as required by the Equal Protection Claim several years earlier. See Gray, 372 U.S. at 381 (equating "political equality" with "one person, one vote"); Reynolds v. Sims, 377 U.S. 533, 568 (1964) ("[A]n individual's right to vote

. . . is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of [other] citizens.").

After a discussion of the policy arguments against a WTA system, including the disenfranchisement of voters and the possibility of "minority candidates" the Court in Williams stated:

> Notwithstanding, it is difficult to equate the deprivations imposed by the [WTA] rule with the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection. In the selection of electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote. Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes. This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious. No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone.

288 F. Supp. at 627. The Supreme Court summarily affirmed without opinion. Williams v. Va. State Bd. of Elections, 393 U.S. 320 (1969) (per curiam).

### C.   Effect of Williams in This Case

The parties disagree over whether Williams controls the outcome of this case. As a general matter, summary affirmances from the Supreme Court cannot be read too broadly, and they do not necessarily endorse the lower court's reasoning. See Mandel v. Bradley, 432 U.S. 173, 176 (1977). However, "[t]hey do

prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Id. For the reasons explained below, the Court concludes that both prongs are satisfied here, and Williams is binding.

The plaintiffs begin by arguing that Williams is not controlling because of two factual distinctions. First, they point out that Williams involved ballots that listed the names of the electors, whereas now, in Massachusetts, only the candidates' names appear. See Mass. Gen. Laws ch. 54, § 43 (requiring that electors' names not be printed on ballot).[1] Second, the plaintiffs point out that Virginia's electors in the 1960s were not bound to vote for their party's chosen candidate, whereas Massachusetts's electors, by statute, are. See Mass. Gen. Laws ch. 53, § 8 (requiring presidential electors to "pledge . . . to vote for the candidate named in the filing"). But the Court in Williams did not rely on these factors, and the plaintiffs shed no light on why these distinctions make any meaningful difference in this case. The Court concludes that they have no bearing on the close similarity between the issues decided in Williams and presented in this case.

---

[1]    It is worth mentioning that Massachusetts's ballots list the candidates' names immediately below the disclaimer, "Electors of president and vice president." Mass. Gen. Laws ch. 54, § 43. In this way, voters are made aware that they are voting for a slate of electors, not the candidates directly.

The plaintiffs next argue that "important doctrinal shifts" since _Williams_ diminish its precedential value. First, they point out that _White v. Regester_, 412 U.S. 755 (1973), struck down the use of a multi-member at-large voting district. The plaintiffs overstate the importance of this holding vis-à-vis _Williams_. _White_ concerned the 1970 reapportionment plan for the Texas House of Representatives. _Id._ at 756. The Court first rejected the lower court's holding that a 9.9 percent population differential between districts, standing alone, made out a prima facie equal protection violation. _Id._ at 763. After pointing out that it has "entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups," the Supreme Court then affirmed the lower court's determination that two specific multimember districts were unconstitutional in light of the state's history of discrimination against African-American and Mexican-American citizens. _Id._ at 765-70. The _White_ Court carefully limited its holding, emphasizing that "multimember districts are not per se unconstitutional." _Id._ at 765.

The plaintiffs do not explain how this holding undercuts the strength of _Williams_ -- and indeed, it does not. The plaintiffs argue that Massachusetts' WTA system is indistinguishable from the ones that _White_ found to "invidiously . . . cancel out or minimize the voting strength" of particular

groups. Id. at 765. But White is readily distinguishable. Unlike White, the plaintiffs here have alleged no facts to suggest that Massachusetts's WTA system was adopted to cancel out the voting strength of any particular group. Rather, as discussed in more detail below, the voting process that underlies the WTA system in Massachusetts is "equally open to participation" by all voters. Id. at 766.

Second, the plaintiffs argue that Bush v. Gore, 531 U.S. 98 (2000), eliminated the invidiousness requirement from "one person, one vote" claims. In Bush, the Supreme Court held: "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." 531 U.S. at 104-05. Framed this way, the plaintiffs seem to be suggesting that, prior to Bush, a "one person, one vote" claim required proof of conduct that was invidious, but after Bush, arbitrary and disparate treatment of voters is sufficient.

For starters, the precedential value of Bush is unclear, as the main opinion expressly states that it is "limited to the present circumstances." 531 U.S. at 109. In light of this cautious language, it is unlikely the Supreme Court intended to overturn Williams. Moreover, Bush does not discuss Williams or the precise issue decided in it. The Supreme Court "does not normally overturn, or . . . dramatically limit, earlier

authority <u>sub silentio</u>." <u>Shalala v. Ill. Council on Long Term Care, Inc.</u>, 529 U.S. 1, 18 (2000).

The plaintiffs are correct that some pre-<u>Bush</u> Supreme Court opinions indicate a violation of the Equal Protection Clause requires proof of invidiousness. <u>See, e.g.</u>, <u>Dusch v. Davis</u>, 387 U.S. 112, 116 (1967) ("[T]he constitutional test under the Equal Protection Clause is whether there is an 'invidious' discrimination."). But then again, so do some post-<u>Bush</u> opinions. <u>See, e.g.</u>, <u>Harris v. Ariz. Indep. Redistricting Comm'n</u>, 136 S.Ct. 1301, 1307 (2017) ("[M]inor deviations from mathematical equality do not, by themselves, make out a prima facie case of invidious discrimination under the Fourteenth Amendment . . . .") (citation and quotation marks omitted).

In short, the plaintiffs' argument fails to appreciate that, over time, the Supreme Court has recognized at least two types of "one person, one vote" violations -- those based on invidious discrimination, and those based on arbitrary and disparate treatment of voters. In <u>Roman v. Sincock</u>, the Court explained that the Equal Protection Clause requires "faithful adherence to a plan of population-based representation," with minor deviations permissible only when "free from any taint of arbitrariness <u>or</u> discrimination." 377 U.S. 695, 710 (1964) (emphasis added). The disjunctive language is consistent with <u>Bush</u> in that it indicates that arbitrariness may suffice to

12

prove a "one person, one vote" violation, even in the absence of invidious discrimination. See also Hunter v. Hamilton Cty. Bd. of Elections, 635 F.3d 219, 234 & n.13 (6th Cir. 2011) (using "arbitrary and disparate" standard for Equal Protection challenge, and noting that "a showing of intentional discrimination has not been required" in prior Supreme Court cases). Cf. Clements v. Fashing, 457 U.S. 957, 967 (1982) ("Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution." (emphasis added)). Accordingly, Bush did not alter the doctrinal requirements of "one person, one vote" claims.[2]

In short, in light of the absence of any material factual difference or doctrinal shifts, the Court concludes that the Supreme Court's summary affirmance in Williams is binding precedent that requires dismissal of the plaintiffs' claims.

### D.  WTA and the Equal Protection Clause

Even if the Court were not bound by Williams, the plaintiffs' claims would still fail for reasons that substantially mirror those given by the three-judge panel in

---

[2]    Even if it had, this would have no bearing on the outcome of this motion. For the reasons explained below, Massachusetts's WTA system does not invidiously discriminate or treat voters in an arbitrary and disparate fashion.

that case. The WTA system for selecting electors simply does not violate the "one person, one vote" principle the way it has been described so far by the Supreme Court.

The plaintiffs' first obstacle is the text of the Constitution. Article II of the Constitution authorizes each state to appoint electors "in such Manner as the [state] Legislature . . . may direct." U.S. Const. art. II, § 1. The Supreme Court long ago observed that "from the formation of the government until now the practical construction of [this] clause has conceded plenary power to the state legislatures in the matter of the appointment of electors." McPherson v. Blacker, 146 U.S. 1, 35 (1892) (emphasis added). For example, a state legislature could mandate appointment by the people (either at large or in districts), by the legislature itself, by the governor, or by the state supreme court. See id.

Of course, this does not permit states to choose a method that violates some other provision of the Constitution. And the plaintiffs here argue that the WTA system chosen by the Massachusetts legislature violates the "one person, one vote" rule. The essence of the rule is that, once a geographical unit for a representative is established, "all who participate in [an] election are to have an equal vote -- whatever their race, whatever their sex, whatever their occupation, whatever their

income, and wherever their home may be in that geographical unit." Gray, 372 U.S. at 379.

On its face, the WTA system in Massachusetts makes none of these forbidden distinctions. Nor does it necessarily cause "arbitrary and disparate treatment of the members of [the] electorate." Bush, 531 U.S. at 105. The WTA system, standing alone, does not treat voters differently at all. Massachusetts counts all presidential and vice-presidential votes equally, and then awards its electors to whichever party's candidate obtains the most votes. In short, this system complies with equal protection because it does not inherently favor or disfavor a particular group of voters. See McPherson, 146 U.S. at 40 ("If presidential electors are appointed by the legislatures, no discrimination is made; if they are elected in districts where each citizen has an equal right to vote, the same as any other citizen has, no discrimination is made.").

The heart of the plaintiffs' assertion of unfairness revolves around their understanding that Massachusetts's WTA system functions as a two-step election. First, voters cast ballots for presidential candidates. Second, the votes are tallied, and the WTA system awards all of the Commonwealth's electors to the winner and zero electors to the candidates of the non-dominant parties. The plaintiffs argue that, in this way, the WTA system discards the votes for the non-dominant

candidates because of where those voters live and the political party with which they associate.

According to the plaintiffs, such a two-step system closely resembles one the Supreme Court declared unconstitutional in Gray. There, the Georgia legislature implemented a "county unit" system for electing statewide representatives. Gray, 372 U.S. at 371. The county unit system allowed the candidate who won the popular vote in a county to obtain the entire unit vote of that county. Id. at 381 n.12. "Thus if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded." Id. The end result of this system "weight[ed] the rural vote more heavily than the urban vote and weight[ed] some small rural counties heavier than other larger rural counties." Id. at 379. This, the Court held, violated the "one person, one vote" principle. Id. at 381.

The plaintiffs' analogy to Gray falls short. Indeed, Gray itself expressly distinguished any resemblance between the county unit system and the electoral college as "inapposite." Id. at 378. The Court also noted that, unlike the county unit system, "[t]he inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent

numerical inequality . . . ." Id. (footnote omitted) (emphasis added). In other words, even accepting the plaintiffs' contention that the electoral college is numerically unfair, Gray teaches that this is an inequality with which we must live because it is embedded in the Constitution.

Moreover, the core constitutional problem from Gray is absent from the WTA system in Massachusetts. Granted, there are some superficial similarities between Gray's county unit system and the electoral college. But what the Supreme Court deemed unconstitutional in Gray was not the use of any unit system, but rather the effect that this particular unit system had in disparately weighing votes. Under Gray's unit system, one unit vote in a rural county represented over 900 residents, whereas the same vote in a rural county represented over 92,000 residents. Id. at 371. This disparity rendered the system unconstitutional. See id. at 379. But the plaintiffs have not explained how Massachusetts's WTA system inflicts a similar harm.

To the extent that the plaintiffs desire nevertheless to invalidate this system and establish a proportionate one, that is not something this Court is empowered to do. See Williams, 288 F. Supp. at 629 (opining that any "proposed limitation on the selection by the State of its presidential electors would require a Constitutional amendment"); see also City of Mobile,

Ala. v. Bolden, 446 U.S. 55, 77-79 (1980) (upholding at-large city commissioner elections and noting that Supreme Court "has sternly set its face against the claim, however phrased, that the Constitution somehow guarantees proportional representation"); Whitcomb v. Chavis, 403 U.S. 124, 158-60 (1971) (holding that multimember districts for state general assembly -- despite "their winner-take-all aspects" -- did not violate Equal Protection Clause "simply because the supporters of losing candidates have no legislative seats assigned to them").

The Court also observes that other lower courts have rejected similar equal protection challenges to WTA systems. See Williams v. North Carolina, Civ. No. 17-00265, 2017 WL 4935858, at *1 (W.D.N.C. Oct. 31, 2017), aff'd sub nom. Williams v. N.C. State Bd. of Elections, 719 F. App'x 256 (4th Cir. 2018) (rejecting plaintiff's challenge to North Carolina's WTA system as "decisively foreclosed by binding precedent"); Conant v. Brown, 248 F. Supp. 3d 1014, 1025 (D. Or. 2017) (noting that "Williams is still good law" which defeated plaintiff's challenge to Oregon's WTA system), aff'd, 726 F. App'x 611 (9th Cir. 2018).

There may be valid policy arguments for and against a WTA system for appointing electors -- and, indeed, for and against the electoral college itself. Under the Constitution and Supreme

Court precedent, though, Massachusetts's WTA system does not violate the "one person, one vote" rule.

### III. <u>Freedom of Association Claim</u>

The plaintiffs' other constitutional claim is based on the First Amendment's protection of the freedom to associate. The theory behind this claim was most recently articulated in Justice Kagan's concurrence in <u>Gill v. Whitford</u>, 138 S. Ct. 1916 (2018). In <u>Gill</u>, the Supreme Court unanimously agreed that a group of plaintiffs challenging Wisconsin's legislative districts as unconstitutionally gerrymandered in violation of the Equal Protection Clause's "one person, one vote" principle had failed to prove that they suffered concrete, individualized harm for purposes of standing. <u>See</u> 138 S. Ct. at 1923, 1931-32.

Justice Kagan wrote separately to discuss the First Amendment theory of constitutional harm. Joined by three justices, she explained that partisan gerrymandering may "infringe the First Amendment rights of association held by parties, other political organizations, and their members." <u>Id.</u> at 1938 (Kagan, J., concurring). That is, there are "significant First Amendment concerns . . . when a State purposely subjects a group of voters or their party to disfavored treatment." <u>Id.</u> (citations and quotation marks omitted). This "associational harm" arises from the reality that a partisan gerrymander may "ravage[] the party [a citizen] works to support." <u>Id.</u> Members

19

of such a "disfavored party" are "deprived of their natural political strength" and "may face difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." Id.

Justice Kagan's opinion drew extensively from the concurring opinion of Justice Kennedy in Vieth v. Jubelirer, 541 U.S. 267 (2004), another partisan gerrymandering case that focused on the Equal Protection Clause but included an alternative theory under the First Amendment. See 541 U.S. at 314 (Kennedy, J., concurring in the judgment). There, Justice Kennedy opined that "[t]he First Amendment may be the more relevant constitutional provision in future [partisan gerrymandering] cases" because the First Amendment prohibits "burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." Id. By "subjecting a group of voters or their party to disfavored treatment by reason of their views," the state improperly infringes on "the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." Id. (quoting California

Democratic Party v. Jones, 530 U.S. 567, 574 (2000)) (emphasis added).

The plaintiffs allege that Massachusetts's WTA system works a similar harm by "discarding" or "diluting" the votes of minority party members who, by virtue of WTA, get no voice in the electoral college. They argue that this amounts to an improper burden under the First Amendment. But unlike a partisan gerrymander, Massachusetts's WTA system does not purposely burden any particular individual, group, or party "by reason of [its] views." Id. Rather, whatever disadvantage the losing party and its members suffer is a function solely of their lack of electoral success. The WTA system in Massachusetts sets the stakes, but it does not help or hurt one group's chances of winning the Commonwealth's electors. As a result, the plaintiffs' complaint does not allege an associational burden for purposes of a First Amendment claim.

## IV.  **Redressability**

The plaintiffs have failed to allege legally cognizable injuries under the Equal Protection Clause or the First Amendment. Therefore, they have also failed to allege an injury to a legally protected interest for purposes of standing. Given this conclusion, the Court need not reach the issue of redressability, another prong of the standing inquiry. Accordingly, I address it only briefly.

The plaintiffs argue that the Court could redress their claimed injury simply by preventing the defendants from using the WTA system "or any other system that fails to treat each Massachusetts citizen's vote for the [p]resident in an equal manner including selection by Congressional District vote." At oral argument, the plaintiffs elaborated, asking the Court to require a system that awards electors in proportion to each party's share of the vote for all parties whose share exceeds a certain (as yet unspecified) threshold.

Ordering a state to implement a particular type of elector-allocation system would raise serious constitutional and federalism concerns. As already discussed, the text of the Constitution expressly provides that "[e]ach State shall appoint [its electors] in such Manner as the Legislature thereof may direct." U.S. Const. art. II, § 1. The Supreme Court has interpreted this language to mean that "the state legislature's power to select the manner for appointing electors is plenary." Bush, 531 U.S. at 104 (2000) (discussing McPherson, 146 U.S. at 35).

Again, it does not follow that a state may exercise this power "in such a way as to violate express constitutional commands." Williams v. Rhodes, 393 U.S. 23, 29 (1968). But here, the plaintiffs ask the Court to affirmatively dictate what type of elector-allocation system Massachusetts must use (i.e., one

that allocates electors in proportion to the votes obtained by each party). The Court doubts that it has the constitutional power to order a state to do this. Instead, the plaintiffs' proposed limitations on a state's allocation of electors would require a constitutional amendment. See Williams, 288 F. Supp. at 629 ("[A]ny other proposed limitation on the selection by the State of its presidential electors would require a Constitutional amendment."). Therefore, the plaintiffs' claim is unredressable in federal court.

### ORDER

The defendants' motion to dismiss (Dkt. No. 21) is **ALLOWED**.


/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge